*108*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 0 6 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| BROWNDREW, L.L.C.<br>Plaintiff, | §<br>§<br>§ |
| V. | §<br>§ |
| TRIAD BUILDERS, INC.; ELSA STATE<br>BANK & TRUST CO.; G & T PAVING CO.;<br>AQUA TECH; VILLANUEVA FENCE &<br>SUPPLY CO.; VALLEY BUILDERS CO.;<br>ROBERT'S WELDING & FABRICATORS,<br>INC.; BOWMAN DISTRIBUTING COMPANY<br>INC.; OMEGA SYSTEMS; GALVAN SHEET<br>METAL SHOP; RAYMOND ROOFING, INC.;<br>EDMANN'S COMMERCIAL REFRIGER-<br>ATION & A/C; SKIPPER'S REPAIR<br>PLUMBING; RZB INC., d/b/a GLOBAL<br>ELECTRIC; LIFETIME INDUSTRIES;<br>BEN'S GLASS AND METAL; KENMARK,<br>INC.; GABRIEL ALCANTAR; ALFREDO<br>GUTIERREZ; M&M COMMERCIAL LAWN<br>SERVICES, INC.; G.D. LOZANO; KEVIN<br>COMIER; JCO SPECIALISTS; OPENING<br>SPECIALTIES AND SUPPLY, INC.; DAL-<br>TILE CORPORATION; DEA SPECIALTIES<br>CO., LTD.; LCM MANAGEMENT CO., INC.<br>d/b/a SOUTH TEXAS FLAG; STAR BUILDING<br>SYSTEMS; MARIO MARON; D&B GENERAL<br>CLEANING; G.T. BLINDS, INC.; ROBERT<br>MARISCAL; THE SHERWIN-WILLIAMS<br>COMPANY; THE STRIPING COMPANY;<br>ROBERTO GOMEZ; A&J PAVING; HOPE<br>LUMBER & SUPPLY CO., L.P.; CONSOL-<br>IDATED ELECTRIC DISTRIBUTORS, INC.;<br>PALMVIEW GLASS & MIRROR, INC.; and<br>FINANCIAL INVESTMENTS, INC.,<br>Defendants. | §§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§<br><br>CIVIL ACTION NO.<br>B-02-137<br><br>**JURY** |

**ELSA STATE BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Page -1-

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant in interpleader, Elsa State Bank "ESB" asks the court to render partial summary judgment against co-defendants EDMANN'S COMMERCIAL REFRIGERATION AND A/C, ROBERTO CARDENAS, JR., D/B/A ROBERT'S WELDING & FABRICATORS, INC., LIFETIME INDUSTRIES, INC., ROBERT SERRA, D/B/A BEN'S GLASS & METAL, D&B GENERAL CLEANING CONTRACTOR, AQUA TECH, G.D. LOZANO, OPENING SPECIALIST AND SUPPLY, INC., ENCINAL INVESTMENTS, INC., ASSIGNEE OF CLAIMANT PALMVIEW GLASS AND MIRROR, GABRIEL ALCANTAR, G&T PAVING CO., A SOLE PROPRIETOR, BOWMAN DISTRIBUTING COMPANY, INC. and LCM MANAGEMENT CO., INC.

1.    Partial summary judgment is proper in this case because there is no genuine issue of any material fact and because ESB is entitled to judgment as a matter of law. Specifically, each of the parties against whom ESB has moved for summary judgment failed to record a mechanic's and materialman's lien affidavit as shown by their statements of claim on file with the Court, and ESB is a secured creditor entitled to priority of payment over all unsecured creditors.

2.    This motion is based on the briefing contained herein, the attached summary judgment evidence, and all pleadings and papers on file.

A.  Introduction

3.    Plaintiff is Browndrew LLC; defendant movant is Elsa State Bank; ESB is moving for summary judgment against co-defendants EDMANN'S COMMERCIAL REFRIGERATION AND A/C, ROBERTO CARDENAS, JR., D/B/A ROBERT'S WELDING & FABRICATORS, INC., LIFETIME INDUSTRIES, INC., ROBERT SERRA, D/B/A BEN'S

GLASS & METAL, D&B GENERAL CLEANING CONTRACTOR, AQUA TECH, G.D.

LOZANO, OPENING SPECIALIST AND SUPPLY, INC., ENCINAL INVESTMENTS, INC.,

ASSIGNEE OF CLAIMANT PALMVIEW GLASS AND MIRROR, GABRIEL ALCANTAR,

G&T PAVING CO., A SOLE PROPRIETOR, BOWMAN DISTRIBUTING COMPANY, INC.

and LCM MANAGEMENT CO., INC. (referred to herein as Respondents).

    4.     On July 5, 2002, plaintiff sued defendants in interpleader as an alleged

innocent stakeholder holding funds owed either to Triad Builders, Inc. ("Triad") under a

construction contract or owed to subcontractors to the extent that such subcontractors

perfected their right to receive the proceeds.

    5.     Each of the parties against whom ESB is moving for summary judgment has

answered this suit and asserted a right to receive monies from the interplead proceeds.

    6.     ESB files this motion for partial summary judgment against the

subcontractors' (herein referred to as respondents) claims for recovery of interplead

proceeds.  Summary judgment should be granted in this case because there is no genuine

issue of fact on any element of respondents' causes of action.

### B.  Statement of Facts

    7.     This Court has jurisdiction of this matter pursuant to 28 USC §1335, this

cause being a civil action in interpleader, and the plaintiff and defendants being of diverse

citizenship as defined in 28 USC § 1332. (See ¶ one of Plaintiff's Complaint). Venue is

proper in Cameron County under 28 USC § 1397.  (See ¶ four of Plaintiff's Complaint).

This case involves an interpleader action in which the plaintiff Browndrew has interplead

$258,349.62 into the registry of this Court.  The asserted basis of the interpleader is as a

result of Browndrew's retention of amounts owed under a construction contract dated June

4, 2002, with defendant Triad. (See ¶ five and ¶ six of Plaintiff's Complaint and Exhibit 1).

       8.      On or about June 27, 2002, Elsa State Bank loaned $200,025.00 to Triad which funds were utilized with regard to the contract between Triad and Browndrew. (See attached Exhibit 2-A). Elsa State Bank secured the loan with an assignment of Triad's right to receive payment on the contract between Triad and Browndrew. (See attached Exhibit 2 and 2-B). The contract between Browndrew and Triad was in the amount of $1,145,990.00. (See Exhibit 1). Elsa State Bank filed a UCC -1 financing statement on December 3, 2001, perfecting its secured claim by describing the assignment of proceeds payable under the Browndrew/Triad contract. (See Exhibit 2-B). ESB is currently owed $94,888.13 by Triad with a per diem of $23.68. (See Exhibit 2).

       9.      Browndrew retained 10% of the total amount of the Triad contract or $114,599.00. Browndrew also withheld payment of additional funds from Triad in the amount of $143,750.62 for a total of $258,349.62. (See ¶ six of Plaintiff's Complaint and Browndrew/Triad contract attached hereto as Exhibit 1). According to Browndrew, the construction was completed on or about March 18, 2002, and Browndrew filed an affidavit of completion reflecting that date on May 7, 2002. (See ¶ six of Plaintiff's Complaint and see affidavit of completion attached as Exhibit 3). Browndrew alleges that it has received claims from subcontractors, materialmen and ESB which exceed the amount withheld and retained by Browndrew. (See ¶ seven of Plaintiff's Complaint). Browndrew neither has nor claims any interest in the interplead funds. (See ¶ twelve of Plaintiff's Complaint). As a result, Browndrew has interplead the funds to allow the claimants to assert their rights to same while at the same time requesting that Browndrew be dismissed and released from any obligation to the defendants. (See ¶ thirteen of Plaintiff's Complaint).

10.    The following defendants failed to record an affidavit claiming a lien against

the Browndrew property as provided by Chapter 53 of the Texas Property Code:

a)    Edmann's Commercial Refrigeration and A/C filed its statement of claim in

the amount of $17,627.91 on October 18, 2002.  Edmann's Commercial

Refrigeration and A/C did not file a lien.  See Court document # 94.

b)    Roberto Cardenas, Jr. d/b/a Robert's Welding & Fabricators, Inc. filed its

statement of claim in the amount of $23,589.00 on October 17, 2002.

Roberto Cardenas, Jr. d/b/a Robert's Welding & Fabricators, Inc. did not file

a lien.  See Court document # 88.

c)    Lifetime Industries, Inc. filed its statement of claim in the amount of

$14,467.00 on October 18, 2002.  Lifetime Industries, Inc. did not file a lien.

See Court document # 97.

d)    Robert Serra, d/b/a Ben's Glass & Metal filed its statement of claim with

counsel for Plaintiff, William Rentfro (see Exhibit 4), in the amount of

$1,802.73.  Robert Serra, d/b/a Ben's Glass & Metal did not file a lien.

e)    D&B General Cleaning Contractor filed its statement of claim with counsel

for Plaintiff, William Rentfro (see Exhibit 5) in the amount of $900.00.  D&B

General Cleaning Contractor's did not file a lien.

f)    Aqua Tech filed its statement of claim in the amount of $2,518.79 on

October 16, 2002.  Aqua Tech did not file a lien.  See Court document # 83.

g)    G.D. Lozano filed its statement of claim with counsel for Plaintiff, William

Rentfro (see Exhibit 6) in the amount of $3,805.00.  G.D. Lozano did not file

a lien.

h)   Opening Specialist and Supply, Inc. filed its statement of claim in the amount
     of $6,732.71 on October 16, 2002.  Opening Specialist and Supply, Inc. did
     not file a lien.  See Court document # 85.

i)   Encinal Investments, Inc., Assignee of Claimant Palmview Glass and Mirror
     filed its statement of claim in the amount of $12,297.64 on October 17,
     2002.  Encinal Investments, Inc., Assignee of Claimant Palmview Glass and
     Mirror did not file a lien.  See Court document # 90.

j)   Gabriel Alcantar filed its statement of claim in the amount of $4,723.00 on
     October 18, 2002.  Gabriel Alcantar did not file a lien.  See Court document
     # 96.

k)   G&T Paving Co., a Sole Proprietor did not file a statement of claim even
     though this Court ordered them to do so.  G&T Paving Co. filed its Answer to
     Plaintiff's Petition for Interpleader on August 1, 2002.  However, G&T Paving
     Co. did not state an amount and did not file a lien.  See Court document #
     18.

l)   Bowman Distributing Company, Inc. did not file a statement of claim even
     though this Court ordered them to do so.  Bowman Distributing Company
     filed its Original Answer and Counterclaim on July 23, 2002 claiming
     $6,866.34.  Bowman Distributing Company, Inc. did not file a lien.  See
     Court document # 4.

m.   LCM Management Co., Inc. did not file a statement of claim even though this
     Court ordered them to do so.  LCM Management Co., Inc. filed its Response
     to Petition in Interpleader on August 14, 2002 claiming $487.13.  LCM

Management Co., Inc. did not file a lien.  See Court document # 23.

## C.  Standard of Review

11.    Summary judgment is proper in any case where there is no genuine issue of

material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

2548, 2552 (1986).  A defendant who seeks summary judgment on a plaintiff's cause of

action must demonstrate the absence of a genuine issue of material fact by either (1)

submitting summary judgment evidence that negates the existence of a material element of

plaintiff's claim or (2) showing there is no evidence to support an essential element of

plaintiff's claim. *Celotex Corp.*, 477 U.S. at 322-25, 106 S.Ct. at 2552-54; *J. Geils Band

Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir.

1996).

## D.  Argument

12.    Each subcontractor or supplier must show that they filed a mechanic's and

materialman's lien in order to show that they are secured creditors with regard to the

interplead proceeds.  Because respondents[1] cannot raise a material fact issue to show

that such liens were filed and recorded, ESB  is entitled to summary judgment.  ESB seeks

a summary judgment to the effect that respondents are unsecured creditors which only take

proceeds of the interpleader action if there are proceeds remaining after all secured

creditors are paid.  ESB also seeks a summary judgment to the effect that it is a secured

creditor which stands in front of respondents with respect to priority of payment of the

---

[1] Edmann's Commercial Refrigeration and A/C, Roberto Cardenas, Jr., d/b/a Robert's Welding &
Fabricators, Inc., Lifetime Industries, Inc., Robert Serra, d/b/a Ben's Glass & Metal, D&B General Cleaning
Contractor, Aqua Tech, G.D. Lozano, Opening Specialist and Supply, Inc., Encinal Investments, Inc.,
Assignee of Claimant Palmview Glass and Mirror, Gabriel Alcantar, G&T Paving Co., a Sole Proprietor,
Bowman Distributing Company, Inc. and LCM Management Co., Inc.

proceeds.

13.     In determining the order of distribution of interpleaded funds, the court sits as a court of equity so as to do equity to all parties who can show that they have an interest in the funds. *Bricks Unlimited Inc. v. Agee*, 672 F.2d 1255, 1261 (5th Cir. 1982). In an interpleader action, secured creditors are entitled to full payment before unsecured creditors receive any payment. *Agee* at 1259 (secured creditors are paid in full before unsecured creditors receive anything); See also *Hebel v. Ebersole*, 543 f.2d 14, 18 (7th Cir. 1976) (holding that secured creditors should be paid before unsecured creditors receive anything in a federal interpleader action). Consequently, if ESB can show that respondents are not secured creditors and that ESB is a secured creditor, ESB will stand in front of respondents with respect to payment of the proceeds.

### E. Respondents are Unsecured Creditors

14.     Chapter 53 of the Texas Property Code governs mechanic's and materialman's liens. *See* Tex. Prop.Code Ann. §§ 53.001-.260 (Vernon 1995 & Supp. 2002). A person who provides labor or materials to construct a building or improvement under a contract with the property owner, the owner's agent, or an original contractor is entitled to a lien against that property. Tex. Prop.Code Ann. §§ 53.021(a) (Vernon Supp. 2002). A subcontractor is considered a derivative claimant and must rely on his statutory lien remedies. *First Nat'l Bank v. Sledge,* 653 S.W.2d 283, 285 (Tex.1983) (discussing earlier versions of lien statutes); *Stolz v. Honeycutt,* 42 S.W.3d 305, 310 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

15.     To perfect a lien, a claimant must substantially comply with subchapter C of chapter 53. Tex. Prop.Code Ann. §§ 53.051 (West 1995); *Sledge,* 653 S.W.2d at 285. In

addition to other requirements which are not the subject of this motion for partial summary judgment, a subcontractor or supplier must file a lien affidavit with the clerk of the county in which the property is located. *Id.* The Property Code provides two methods by which a subcontractor can perfect a lien upon the owner's property; funds trapping and statutory retainage. See Tex. Prop.Code. §§§§ 53.084(b), 53.105(a). A subcontractor, therefore, has two remedies against the owner under the Property Code, and neither one is an exclusive remedy. See *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 622 (Tex.App.--Fort Worth 1990, no writ); Tex. Prop.Code §§ 53.084(b) (stating the owner is liable on a claim for trapped funds in addition to a claim for statutory retainage).

16.    With respect to lien claims against retainage, the party must file their lien within 30 days of the date the building is completed. Tex. Prop.Code Ann. §§ 53.101 (Vernon 1995). Under Property Code section 53.101 ("Statutory Retainage Statute"), an owner, under an original contract for which a mechanic's lien may be claimed, is required to retain 10 percent of the contract price of the work to the owner or 10 percent of the value of the work during the progress of work and for 30 days after the work is completed. Tex. Prop.Code Ann. §§ 53.101 (Vernon 1995). A claimant has a lien on the retained funds if the claimant (1) sends the notices required by Chapter 53 in the time and manner required; and (2) files an affidavit claiming a lien within the statutory time periods and not later than the 30th day after the work is completed. Tex. Prop.Code Ann. §§ 53.103 (Vernon 1995). If the owner retains the funds in compliance with §53.101, the party claiming the lien must file the affidavit claiming lien within thirty days after the project is completed.

17.    Under the fund trapping method for perfecting a lien, the subcontractor can trap funds payable to the original contractor if he gives the owner timely notice that he has

not been paid. *Bond v. Kagan-Edelman Enterprises*, 985 S.W.2d 253
(Tex.App.–Houston [1st Dist.] 1999, partially reversed on other grounds at 20 S.W.3d 706).
If the owner pays any money to the original contractor after receiving notice from the
subcontractor, the owner is liable and his property is subject to a lien to the extent of the
money paid <u>so long as the party files a lien</u>. *Id.* (Emphasis added)

18.     In order to perfect their lien under either the funds trapping statute or the
retainage statute, the subcontractor or supplier must file the affidavit no later than "the 15th
day of the fourth calendar month after the day on which the indebtedness accrues." Tex.
Prop.Code Ann. §§ 53.051; 53.052(a) (Vernon Supp. 2002); Tex. Prop. Code Ann.
§§53.082 and 53.084 (Vernon Supp. 2002) and *Hadnot v. Wenco Distributors*, 961
S.W.2d 232, 235 (Tex.App.–Houston [1st Dist.] 1997 no writ). The indebtedness accrues
to a subcontractor on the last day of the last month in which the labor was performed or
material was furnished. Tex. Prop.Code Ann. §§ 53.052(c) Failure to record the lien
results in a loss of the lien, and there is no remedy against the owner. *Hadnot* at 235.

19.     Under each of the above statutes, the subcontractor or supplier must file a
lien no later than four months after the date that the indebtedness accrued. This motion for
partial summary judgment is directed to all parties (mentioned below) who have failed to
file a lien as of the date of the filing of this motion for summary judgment. According to
their statements of claim on file with this Court, the following parties failed to file a lien:

a)     Edmann's Commercial Refrigeration and A/C;

b)     Roberto Cardenas, Jr. d/b/a Robert's Welding & Fabricators, Inc.;

c)     Lifetime Industries, Inc.;

d)     Robert Serra, d/b/a Ben's Glass & Metal;

    e)      D&B General Cleaning Contractor;

    f)      Aqua Tech;

    g)      G.D. Lozano;

    h)      Opening Specialist and Supply, Inc.;

    i)      Encinal Investments, Inc., Assignee of Claimant Palmview Glass and Mirror; and

    j)      Gabriel Alcantar.

The following parties failed to file a statement of claim (even though ordered by this Court to do so) but did file an answer to the lawsuit. None of the below listed parties asserted in their answers that they filed a lien:

    k)      G&T Paving Co., a Sole Proprietor;

    l)      Bowman Distributing Company, Inc.; and

    m)    LCM Management Co., Inc.

    20.    As mentioned above in the facts section, the building was completed on March 18, 2002. (See Exhibit 3–Affidavit of Completion) However, the affidavit of completion was not recorded until May 7, 2002. For the purposes of this motion for partial summary judgment only and without waiver of the right to assert an earlier completion date, the May 7, 2002 date of filing the affidavit of completion will be used as the completion date.

    21.    In order to perfect their lien under either the funds trapping statute or the retainage statute, the subcontractor or supplier must file the affidavit no later than "the 15th day of the fourth calendar month after the day on which the indebtedness accrues." Tex. Prop.Code Ann. §§ 53.051; 53.052(a) (Vernon Supp. 2002). The indebtedness to a

subcontractor accrues on the last day of the month in which the labor was performed or the materials were supplied.  Tex. Prop.Code Ann. §§ 53.053(c) (Vernon Supp. 2002)  No labor was performed nor material supplied by any of the respondents after the completion date of May 7, 2002.  Consequently, the latest possible date upon which the indebtedness accrued would be May 31, 2002.

22.    Therefore, the respondents had to file their liens at the very latest by September 15, 2002. (the 15th day of the fourth calendar month counted as follows: June was month one; July was month two; August was month three; September was month four.) Each of the respondents against whom ESB has moved for summary judgment have failed to file a lien as shown by their attached statements of claim, consequently ESB is entitled to a summary judgment against respondents. Because they failed to file liens, each of these parties has an <u>unsecured claim against Triad,</u> and no claim against Browndrew.  As to the interplead funds, each of these unsecured parties would at most have an unsecured claim against the interplead funds which would be inferior to any secured claims.

### F. No Evidence Summary Judgment

23.    In addition to a traditional motion for summary judgment described above, ESB moves for summary judgment against respondents on the basis that they cannot provide any evidence which shows that they have timely and properly perfected a mechanic's and materialman's lien against the Browndrew property.  The second portion of ESB's motion for partial summary judgment involves ESB's assertion that it is a secured creditor entitled to priority over unsecured creditors.

### G. ESB is a Secured Creditor

24.    As stated above in the Facts portion of this motion for partial summary

judgment, plaintiff and defendant Triad entered into a contract on June 4, 2001 for the construction of the building at issue. (See attached Exhibit 1). On June 27, 2001, ESB loaned $200,025.00 to Triad in part to provide working capital for the Browndrew/Triad contract. (Exhibit 2 and 2-A). ESB obtained a general security interest in Triad's accounts receivable securing the note and also received a specific security interest in the right to receive the proceeds under the contract (See Exhibit 2-A,C,D). ESB perfected its security interest when it filed a UCC-1 financing statement relating to this security. (See Exhibit 2-B). ESB is currently owed $94,888.13 by Triad under the note. (See Exhibit 2).

25.    As a secured creditor, ESB stands in front of all unsecured creditors (subcontractors and suppliers who failed to timely provide lien notices and record liens). See *Bricks Unlimited Inc. v. Agee*, 672 F.2d 1255, 1261 (5th Cir. 1982) and see *Hebel v. Ebersole*, 543 f.2d 14, 18 (7th Cir. 1976) (federal interpleader actions holding that secured creditors are entitled to payment in full before unsecured creditors receive anything in an interpleader action).

26.    Texas courts have also held that secured creditors stand in front of unsecured creditors with respect to the remedy of interpleader. The *Mbank El Paso National Association v. Featherlite Corporation*, 792 S.W.2d 472 (Tex.App.–El Paso 1990, writ denied) case involved an interpleader with very similar facts to the case at bar as it relates to priority of contract funds. In *Featherlite*, the Court held that a bank's secured interest in accounts receivable of a contractor was superior to an unsecured materialman's claim to the contract proceeds. *Id* at 475-476. In *Featherlite*, the bank received payment in full to the exclusion of the materialman. The bank's rights in *Featherlite* were based upon its security interest in accounts receivable (exactly like

ESB's interest).

27.     Lastly, respondents cannot assert that their rights under the Trust Fund Act codified in Property Code Chapter 162 provide them with priority over Elsa State Bank. See *Republicbank Dallas v. Interkal*, 691 S.W.2d 605, 607 (Tex. 1985) (holding that a subcontractor or materialman's claims under the Trust Fund Act are inferior to a bank's secured claims because the Trust Fund Act expressly does not apply to banks).  ESB is entitled to the balance of any interplead funds remaining (up to $94,888.13) after subtracting any amounts from the interplead funds paid to subcontractors who have properly perfected their liens under Texas law.

## H.  Conclusion

28.     For these reasons, defendant ESB asks the court to grant the motion and render a partial summary judgment providing that respondents' claims are unsecured claims that are inferior to all parties who have secured claims and that ESB has a secured claim superior to respondents' claims.

Respectfully submitted,

JONES, GALLIGAN, KEY & LOZANO, L.L.P.
Town Center Tower, Suite 300
2300 West Pike Boulevard
Post Office Drawer 1247
Weslaco, Texas 78599-1247
Telephone: (956) 968-5402
Telecopier: (956) 969-9402

By:     _____
LANCE A. KIRBY
Federal I.D No.: 21811
State Bar No.: 00794096

Of Counsel:

TERRY D. KEY
Federal I.D. No.: 1205
State Bar No.: 11370200
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
Town Center Tower, Suite 300
2300 West Pike Boulevard
Post Office Drawer 1247
Weslaco, Texas 78599-1247
Telephone: (956) 968-5402
Telecopier: (956) 969-9402

**ATTORNEYS FOR DEFENDANT
ELSA STATE BANK & TRUST CO.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of ELSA STATE BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT and ORDER ON ELSA STATE BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT have been forwarded to the following attorneys on this the __6th__ day of November, 2002:

William L. Rentfro
RENTFRO, FAULK, & BLAKEMORE, L.L.P.
185 E. Ruben Torres Blvd.
Brownsville, Texas 78520
Telephone: (956) 541-9600
Telecopier: (956) 541-3414
**Attorney for Plaintiff**

Gregory E. Turley
ATTORNEY AT LAW
504 E. Dove Ave., Suite B
McAllen, Texas 78504
Telephone: (956) 682-8531
Telecopier: (956) 682-9533
**Attorneys for The Sherwin-Williams
Company**

G.D. Lozano
P.O. Box 854
La Feria, Texas 78559
**Pro-Se**

Jerry L. Stapleton
STAPLETON, CURTIS & BOSWELL
515 E. Harrison, Ste. A
Harlingen, Texas 78550
Telephone: (956) 428-9191
Telecopier: (956) 428-9283
**Attorneys for Bowman Distributing Co., Inc.**

Marshall R. Ray
Elizabeth Guerrero
RANSOME & RAY, P.C.
550 E. Levee St.
Brownsville, Texas 78520
Telephone: (956) 542-3642
Telecopier: (956) 542-3698
**Attorneys for Skipper's Repair Plumbing**

Robert L. Eden
MATTHEWS, CARLTON, STEIN, SHIELS, PEARCE
  & KNOTT
8131 LBJ Freeway Ste. 700
Dallas, Texas 75251
Telephone: (972) 234-3400
Telecopier: (972) 234-1750
**Consolidated Electrical Distributors, Inc.**

Mauro L. Reyna, III
LAW OFFICE OF MAURO L. REYNA, III
P.O. Box 969
Penitas, Texas 78576
Telephone: (956) 584-7822
Telecopier: (956) 584-8718
**Attorneys for Robert Cardenas, Jr. d/b/a
Robert's Welding & Fabricators, Inc.**

Sam Drugan
Marshall L. Armstrong
WARREN, DRUGAN & BARROWS
800 Broadway
San Antonio, Texas 78215
Telephone: (210) 226-4131
Telecopier: (210) 224-6488
**Attorneys for D.E.A. Specialties Co., LTD**

M. Steven Deck
LAW OFFICE OF JOHN KING
3409 N. 10th St., Ste. 100
McAllen, Texas 78501
Telephone: (956) 687-6294
Telecopier: (956) 687-5514
**Attorneys for Robert Mariscal**

Daniel G. Rios
LIFETIME INDUSTRIES, INC.
323 Nolana
McAllen, Texas 78504
Telephone: (956) 630-9401
Telecopier: (956) 682-0566
**Attorneys for Lifetime Industries, Inc.**

Thomas J. Walthall, Jr.
Brad L. Sklencar
THE GARDNER LAW FIRM
745 E. Mulberry, Suite 100
San Antonio, Texas 78212
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
**Attorneys for RZB, Inc., d/b/a Global Electric**

Brittany L. Wills
Mark W. Walker
WALKER & TWENHAFEL, L.L.P.
P.O. Drawer 3766
McAllen, Texas 78502-3766
Telephone: (956) 687-6225
Telecopier: (956) 686-1276
**Attorneys for Opening Specialties and
Supply, Inc.**

Alfredo Padilla
ATTORNEY AT LAW
1000 E. Van Buren
Brownsville, Texas 78520
Telephone: (956) 544-7100
Telecopier: (956) 544-0647
**Attorney for Alfredo Gutierrez and Gabriel
Alcantar**

Eduardo Martinez
EDMANN'S COMMERCIAL
REFRIGERATION AND A/C
705 S. San Antonio
San Juan, Texas 78589
**Pro-Se**

Michael A. McGurk
KITTLEMAN, THOMAS, RAMIREZ & GONZALEZ
4900-B North Tenth
McAllen, Texas 78504
Telephone: (956) 686-8797
Telecopier: (956) 630-5199
**Attorneys for Hope Lumber &
Supply Company, L.P.**

Abel Gonzalez
G&T PAVING COMPANY
P.O. Box 5136
Brownsville, Texas 78520
**Pro-Se**

Curtis Bonner
BONNER & BONNER
P.O. Box 288
Harlingen, Texas 78551
Telephone: (956) 423-9152
Telecopier: (956) 428-0671
**Attorneys for M&M Commercial Lawn
Services**

John Skaggs
LAW OFFICE OF JOHN SKAGGS
P.O. Drawer 2285
710 Laurel
McAllen, Texas 78502-2285
Telephone: (956) 687-8216
Telecopier: (956) 630-6570
**Attorneys for LCM Management Co., Inc.**

Antonio Villeda
LAW OFFICE OF ANTONIO VILLEDA
5414 North 10th Street
McAllen, Texas 78504
Telephone: (956) 631-9100
Telecopier: (956) 631-9146
**Attorney for Encinal Investments, Inc. and as
Assignee to Palm Valley Glass and Mirror,
Inc.**

Robert F. Evans
AQUA TECH
4305 N. 10th
McAllen, Texas 78504
**Pro-Se.**

LANCE A. KIRBY

1997 Edition - Electronic Format

AIA Document A111 - 1997

# *Standard Form of Agreement Between Owner and Contractor*

*where the basis for payment is the COST OF THE WORK PLUS A FEE with a negotiated Guaranteed Maximum Price*

**AGREEMENT** made as of the Fourth day of June in the year 2001
(In words, indicate day, month and year)

**BETWEEN** the Owner:
(Name, address and other information)

BROWNDREW, LLC
656 W. Randolph St. Suite 400
Chicago, Illinois 60661

and the Contractor:
(Name, address and other information)

Triad Builder,Inc.
2300 W. Pike Blvd., Suite 204
Weslaco, Texas 78596

The Project is:
(Name and location)

SSA - Brownsville, The Drew Group, Lease Construct
1735 Coffeeport Road
Brownsville, Texas 78521

The Architect is:
(Name, address and other information)

Valerio, Dewalt, Train Associates, Inc.
500 North Dearborn, 9th Floor
Chicago, Illinois 60610

The Owner and Contractor agree as follows.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

## ARTICLE 1  THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

## ARTICLE 2  THE WORK OF THIS CONTRACT
The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3  RELATIONSHIP OF THE PARTIES



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

1



EXHIBIT

1

The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*
The date of commencement shall at least,
Five (5) Days after City of Brownsville issues a Building Permit on this project to Triad Builders, Inc.

If, prior to commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

4.2 The Contract Time shall be measured from the date of commencement.

4.3 The Contractor shall achieve Substantial Completion of the entire Work not later than One hundred eighty (180) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time, or for bonus payments for early completion of the Work.)*
No liquidated damages. No early completion bonus.

## ARTICLE 5  BASIS FOR PAYMENT
### 5.1  CONTRACT SUM
5.1.1  The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

5.1.2  The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*
One Hundred Thousand ($ 100,000.00) plus 9.24% of the cost of any Change Orders.

### 5.2 GUARANTEED MAXIMUM PRICE
5.2.1  The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed One Million One Hundred Forty Five Thousand Nine Hundred Ninety Dollars ($ 1,145,990.00 ), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

2

*(Insert specific provisions if the Contractor is to participate in any savings.)*
<u>Shared Savings on total Cost of Work shall be divided equally between Contractor and Owner.</u>
<u>50% Brown Drew LLC</u>
<u>50% Triad Builders, Inc.</u>

**5.2.2**  The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*
<u>No Alternates</u>

**5.2.3**  Unit prices, if any, are as follows:
<u>Brick Purchase $ 375.00/1,000 pcs.</u>

**5.2.4**  Allowances, if any, are as follows:
*(Identify and state the amounts of any allowances, and state whether they include labor, materials, or both.)*
<u>No Allowances</u>

**5.2.5**  Assumptions, if any, on which the Guaranteed Maximum Price is based are as follows:
<u>The( Items in Value and Engineering) as shown in Exhibit "B" are excepted and will be incorporated into the Drawing and Specification. In the event there are additional revision to the Drawings and Specification, the Contractor and Owner shall agree to and appropriate modifications of the Guaranteed Maximum Price.</u>

**5.2.6**  To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

## ARTICLE 6  CHANGES IN THE WORK

**6.1** Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Subparagraph 7.3.3 of AIA Document A201-1997.

**6.2** In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Clause 7.3.3.3 of AIA Document A201-1997 and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Subparagraph 7.3.6 of AIA Document A201-1997 shall have the meanings assigned to them in AIA Document A201-1997 and shall not be modified by Articles 5, 7 and 8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

**6.3** In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201-1997 shall mean the Cost of the Work as defined in Article 7 of this Agreement and the terms "fee" and "a reasonable allowance for overhead and profit" shall mean the Contractor's Fee as defined in Subparagraph 5.1.2 of this Agreement.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss_building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

3

6.4 If no specific provision is made in ... aragraph 5.1 for adjustment of the Contractor's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Paragraph 5.1 will cause substantial inequity to the Owner or Contractor, the Contractor's Fee shall be equitably adjusted on the basis of the Fee established for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.

# ARTICLE 7  COSTS TO BE REIMBURSED
## 7.1 COST OF THE WORK
The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

## 7.2 LABOR COSTS
7.2.1   Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

7.2.2    Wages or salaries of the Contractor's supervisory and administrative personnel when stationed at the site with the Owner's approval.
*(If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify in Article 14 the personnel to be included and whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*
<u>Job Superintendent $ 600.00/wk. full time.</u>
<u>Project Manager $ 18.75/hr. Part time.</u>

7.2.3   Wages and salaries of the Contractor's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

7.2.4    Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Subparagraphs 7.2.1 through 7.2.3.

## 7.3 SUBCONTRACT COSTS
7.3.1   Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

## 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION
7.4.1    Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

7.4.2    Costs of materials described in the preceding Subparagraph 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 – 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss_building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

**7.5.1**   Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.

**7.5.2**   Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers that are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

**7.5.3**   Costs of removal of debris from the site.

**7.5.4**   Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**7.5.5**   That portion of the reasonable expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

**7.5.6**   Costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

## 7.6 MISCELLANEOUS COSTS

**7.6.1**   That portion of insurance and bond premiums that can be directly attributed to this Contract:

**7.6.2**   Sales, use or similar taxes imposed by a governmental authority that are related to the Work.

**7.6.3**   Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**7.6.4**   Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Subparagraph 13.5.3 of AIA Document A201-1997 or other provisions of the Contract Documents, and which do not fall within the scope of Subparagraph 7.7.3.

**7.6.5**   Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Subparagraph 3.17.1 of AIA Document A201-1997 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**7.6.6**   Data processing costs related to the Work.

**7.6.7**   Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document is not intended for use in competitive bidding.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss_building.aia -- 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

**7.6.8**  Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

**7.6.9**  Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the Owner.

## 7.7 OTHER COSTS AND EMERGENCIES

**7.7.1**  Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**7.7.2**  Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Paragraph 10.6 of AIA Document A201-1997.

**7.7.3**  Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recoverable by the Contractor from insurance, sureties, Subcontractors or suppliers.

## ARTICLE 8 COSTS NOT TO BE REIMBURSED

**8.1** The Cost of the Work shall not include:

**8.1.1**  Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Subparagraphs 7.2.2 and 7.2.3 or as may be provided in Article 14.

**8.1.2**  Expenses of the Contractor's principal office and offices other than the site office.

**8.1.3**  Overhead and general expenses, except as may be expressly included in Article 7.

**8.1.4**  The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

**8.1.5**  Rental costs of machinery and equipment, except as specifically provided in Subparagraph 7.5.2.

**8.1.6**  Except as provided in Subparagraph 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable.

**8.1.7**  Any cost not specifically and expressly described in Article 7.

**8.1.8**  Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

## ARTICLE 9 DISCOUNTS, REBATES AND REFUNDS

**9.1** Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefor from the Owner, or (2) the Owner has deposited

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document is not intended for use in competitive bidding.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group s»building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be secured.

**9.2**     Amounts that accrue to the Owner in accordance with the provisions of Paragraph 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10 SUBCONTRACTS AND OTHER AGREEMENTS

**10.1**     Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons or entities from whom the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Contractor and the Architect, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

**10.2**     If a specific bidder among those whose bids are delivered by the Contractor to the Architect (1) is recommended to the Owner by the Contractor; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Contractor may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Contractor and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

**10.3**     Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

## ARTICLE 11   ACCOUNTING RECORDS
The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12   PAYMENTS
**12.1     PROGRESS PAYMENTS**
**12.1.1**   Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**12.1.2**   The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**12.1.3**   Provided that an Application for Payment is received by the Architect not later than the First day of a month, the Owner shall make payment to the Contractor not later than the Twentieth day of the Same month. If an Application for Payment is received by the

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss building.aia — 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

Architect after the application date fixed above, payment shall be made by the Owner not later than <u>Twenty</u> days after the Architect receives the Application for Payment.

12.1.4   With each Application for Payment, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

12.1.5   Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

12.1.6   Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

12.1.7   Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1   take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997;

.2   add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

.3   add the Contractor's Fee, less retainage of <u>Ten</u> percent ( <u>10</u> %).The Contractor's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4   subtract the aggregate of previous payments made by the Owner;

.5   subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation; and

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

**.6** subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

**12.1.8** Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less than <u>Ten</u> percent ( <u>10</u> %). The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments and retention for Subcontractors.

**12.1.9** In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Subparagraph 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.

## 12.2  FINAL PAYMENT

**12.2.1**  Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

> **.1**  the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

> **.2**  a final Certificate for Payment has been issued by the Architect.

**12.2.2**      The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**12.2.3**  The Owner's accountants will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the Architect by the Contractor. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the final accounting, and provided the other conditions of Subparagraph 12.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's accountants, either issue to the Owner a final Certificate for Payment with a copy to the Contractor, or notify the Contractor and Owner in writing of the Architect's reasons for withholding a certificate as provided in Subparagraph 9.5.1 of the AIA Document A201-1997. The time periods stated in this Subparagraph 12.2.3 supersede those stated in Subparagraph 9.4.1 of the AIA Document A201-1997.

**12.2.4**  If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount without a further decision of the Architect. Such demand for arbitration shall be made by the Contractor within 30 days after the Contractor's receipt of a copy of the Architect's final Certificate for Payment; failure to demand arbitration within this 30-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Contractor. Pending a final resolution by arbitration, the Owner shall pay the Contractor the amount certified in the Architect's final Certificate for Payment.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document is not intended for use in competitive bidding.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A111 - 1997**
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss.building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

12.2.5  If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Contractor has participated in savings as provided in Paragraph 5.2, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Contractor.

## ARTICLE 13   TERMINATION OR SUSPENSION

13.1    The Contract may be terminated by the Contractor, or by the Owner for convenience, as provided in Article 14 of AIA Document A201-1997. However, the amount to be paid to the Contractor under Subparagraph 14.1.3 of AIA Document A201-1997 shall not exceed the amount the Contractor would be entitled to receive under Paragraph 13.2 below, except that the Contractor's Fee shall be calculated as if the Work had been fully completed by the Contractor, including a reasonable estimate of the Cost of the Work for Work not actually completed.   TCA. 6-22-2001       26. June 01

13.2    The Contract may be terminated by the Owner for cause as provided in Article 14 of AIA Document A201-1997. The amount, if any, to be paid to the Contractor under Subparagraph 14.2.4 of AIA Document A201-1997 shall not cause the Guaranteed Maximum Price to be exceeded, nor shall it exceed an amount calculated as follows:

13.2.1   Take the Cost of the Work incurred by the Contractor to the date of termination;

13.2.2   Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Subparagraph 5.1.2 or, if the Contractor's Fee is stated as a fixed sum in that Subparagraph, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and

13.2.3   Subtract the aggregate of previous payments made by the Owner.

13.3    The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Subparagraph 13.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the payments referred to in this Article 13, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

13.4    The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997; in such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Subparagraph 14.3.2 of AIA Document A201-1997 except that the term "profit" shall be understood to mean the Contractor's Fee as described in Subparagraphs 5.1.2 and Paragraph 6.4 of this Agreement.

## ARTICLE 14   MISCELLANEOUS PROVISIONS

14.1    Where reference is made in this Agreement to a provision AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss, building.aia — 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

14.2    Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

14.3    The Owner's representative is:
*(Name, address and other information.)*
Thomas Boucher
656 W. Randolph St. Suite 400
Chicago, IL. 60661

14.4    The Contractor's representative is:
*(Name, address and other information.)*
Thearl Clay Adams
2300 W. Pike Blvd., Suite 204
Weslaco, TX 78596

14.5    Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

14.6    Other provisions:
Exhibit "A" Project Schedule To be received by Thursday June 28, 2001.
Exhibit "B" Value Engineered Items.
Exhibit "C" List of Drawings.
Exhibit "D" Certificate of Insurance
Exhibit "E" Exclusions.
Exhibit "F" Lease Agreement Between The Drew Group and GSA; items pertaining to construction.
Exhibit "G" Construction Budget.

## ARTICLE 15    ENUMERATION OF CONTRACT DOCUMENTS

15.1    The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

15.1.1    The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A111-1997.

15.1.2    The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

15.1.3    The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| Document | Title | Pages |
|---|---|---|

None

15.1.4    The Specifications are those contained in the Project Manual dated as in Subparagraph 15.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---|---|---|

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group ss Building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

U.S. Government Lease for Real Property NO.GS-07B-14931

15.1.5  The Drawings are as follows, ʳ   are dated  unless a different date is shown be.
*(Either list the Drawings here or refer to an exhi.  .tached to this Agreement.)*

| Number | Title | Date |
|--------|-------|------|

See attached list of drawings. Exhibit "C"

15.1.6  The Addenda, if any, are as follows:

| Number | Date | Pages |
|--------|------|-------|

None

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 15.

15.1.7  Other Documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents, such as a list of alternates that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

Exhibit "A" Project Schedule To be received by Thursday June 28, 2001.
Exhibit "B" Value Engineered Items.
Exhibit "C" List of Drawings.
Exhibit "D" Certificate of Insurance.
Exhibit "E" List of Exclusions.
Exhibit "F" Lease Agreement Between The Drew Group and GSA; items pertaining to construction.
Exhibit "G" Construction Budget.

## ARTICLE 16  INSURANCE AND BONDS
*(List required limits of liability for insurance and bonds. AIA Document A201-1997 gives other specific requirements for insurance and bonds.)*
Exhibit "D" Certificate of Insurance will follow by June  28, 2001.

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

OWNER *(Signature)*

MEMBER

BROWN DREW LLC
*(Printed name and title)*

26 June 01

Triad Builders, Inc.

CONTRACTOR *(Signature)*
Thearl C. Adams
Construction Manager
*(Printed name and title)*

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document is not intended for use in competitive bidding.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A111 - 1997
OWNER - CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1920, 1925, 1951, 1961, 1963, 1967, 1974, 1978, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject he violate to legal prosecution. WARNING: Unlicensed  photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: drew group s> building.aia – 6/22/2001. AIA License Number 1019006, which expires on 3/5/2002.

## **AFFIDAVIT**

STATE OF TEXAS        §
                             §

COUNTY OF HIDALGO    §

      BEFORE ME, the undersigned Notary Public, on this day personally appeared **TED SUNDERLAND**, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

      "My name is **TED SUNDERLAND**. I am over the age of 21 years. I am of sound mind and each and every statement contained herein is within my personal knowledge and is true and correct. I am fully competent to testify to the matters stated below."

      "I am the acting executive vice president of Elsa State Bank & Trust Co., Weslaco Banking Center ("ESB") located at 203 E. Business 83, Suite A in Weslaco, Texas. On June 27, 2001, Elsa State Bank loaned Triad Builders Inc. ("Triad") $200,025.00. By virtue of my position within the Bank, I have personal knowledge of this loan since I was the executive vice president at the time of transaction. The loan was made in part to provide working capital with respect to the Browndrew/Triad contract at issue in this interpleader action."

      "As part of this loan transaction, Triad entered into a security agreement with ESB in which it provided a security interest to ESB and an assignment of all proceeds that Triad would receive under the Browndrew/Triad contract. ESB perfected the security interest by filing a UCC-1 with the Texas Secretary of State on December 3, 2001. The loan has been renewed as reflected by the attached exhibits described below. Triad currently owes ESB $94,888.13 under the notes and renewals reflected by Exhibits A, C and D with a per diem of $23.68 per day. Triad is currently in default under the notes and renewals."

      "I hereby certify that the copies of the following exhibits attached hereto are true and correct copies of the originals:"

Exhibit A; Note between Triad and ESB dated June 27, 2001
Exhibit B; UCC-1 filing with the Secretary of State dated December 3, 2001
Exhibit C; Renewal of Note dated February 26, 2002.
Exhibit D; Renewal of Note dated October 3, 2002.

Further Affiant sayeth not.

                                   _____
                                     TED SUNDERLAND

      SUBSCRIBED AND SWORN TO BEFORE ME on this the 4th day of November, 2002, to certify which witness my hand and official seal.



LETICIA RODRIGUEZ
Notary Public, State of Texas
My Commission Expires
August 26, 2004

_____
Notary Public in and for the State of



**EXHIBIT**
**2**

| | | |
|---|---|---|
| TRIAD BUILDERS, INC.<br>2300 W. PIKE BLVD.<br>WESLACO, TX 78596 | ELSA STATE BANK & TRUST CO.<br>WESLACO BANKING CENTER<br>203 E. BUSINESS 83, SUITE A<br>WESLACO TX 78596 | Loan Number __111832373__<br>Date __Jun 27, 2001__<br>Maturity Date __Jan 23, 2002__<br>Loan Amount $ __200,025.00__<br>Renewal Of __111832370__ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | 111823 73 |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of _____

TWO HUNDRED THOUSAND TWENTY FIVE AND NO/100 _____ Dollars $ _____200,025.00_____

☐ **Single Advance:** I will receive all of this principal sum on _____ . No additional advances are contemplated under this note.

☒ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On __06/27/2001__

_____ I will receive the amount of $ __125,020.00__ and future principal advances are contemplated.

Conditions: The conditions for future advances are _____

☐ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all other conditions and expires on _____

☒ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.

INTEREST: I agree to pay interest on the outstanding principal balance from __June 27, 2001__ at the rate of __12.50__ %

per year until __January 23, 2002__ .

☐ **Variable Rate:** This rate may change as stated below.

☐ Index Rate: The future rate will be __N/A__ the following index rate: __N/A__

☐ Ceiling Rate: The interest rate ceiling for this note is the _____ ceiling rate announced by the _____ commissioner from time to time.

☐ Frequency and Timing: The rate on this note may change as often as _____
A change in the interest rate will take effect _____

☐ Limitations: During the term of this loan, the applicable annual interest rate will not be more than __N/A__ % or less than __N/A__ %. The rate may not change more than __N/A__ % each __N/A__ .

Effect of Variable Rate: A change in the interest rate will have the following effect on the payments:

☐ The amount of each scheduled payment will change.    ☐ The amount of the final payment will change.

☐ _____

ACCRUAL METHOD: Interest will be calculated on a __actual/365 day__ basis.

POST MATURITY RATE: I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:

☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).

☐ at a rate equal to _____

☒ LATE CHARGE: If a payment is made more than __10__ days after it is due, I agree to pay a late charge of __5%__ .

☐ ADDITIONAL CHARGES: In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount above: _____

PAYMENTS: I agree to pay this note as follows:

☒ Interest: I agree to pay accrued interest __in 6 monthly installments beginning July 23, 2001 and with the principal at__
__Maturity, January 23, 2002.__

☒ Principal: I agree to pay the principal __at Maturity, January 23, 2002.__

☐ Installments: I agree to pay this note in _____ payments. The first payment will be in the amount of $ _____
and will be due _____ . A payment of $ _____ will be due _____
_____ thereafter. The final payment of the entire
unpaid balance of principal and interest will be due _____

PURPOSE: The purpose of this loan is __SUPPORT CONTRACT RECEIVABLE__ .

ADDITIONAL TERMS:

## SECURITY

SECURITY INTEREST: I give you a security interest in all of the Property described below that I now own and that I may own in the future (including, but not limited to, all parts, accessories, repairs, improvements, and accessions to the Property), wherever the Property is or may be located, and all proceeds and products from the Property.

☐ Inventory: All inventory which I hold for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☐ Equipment: All equipment including, but not limited to, all machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and recordkeeping equipment, and parts and tools. All equipment described in a list or schedule which I give to you will also be included in the secured property, but such a list is not necessary for a valid security interest in my equipment.

☐ Farm Products: All farm products including, but not limited to:
(a) all poultry and livestock and their young, along with their products, produce and replacements;
(b) all crops, annual or perennial, and all products of the crops; and
(c) all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☒ Accounts, Instruments, Documents, Chattel Paper and Other Rights to Payment: All rights I have now and that I may have in the future to payment including, but not limited to:
(a) payment for goods and other property sold or leased or for services rendered, whether or not I have earned such payment by performance; and
(b) any payment arising out of all present and future debt instruments, chattel paper and loans and obligations receivable.
The above include my rights and interests (including all liens and security interests) which I may have by law or agreement against any account debtor or obligor of mine.

UNIVERSAL NOTE AND SECURITY AGREEMENT<br>© 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 5/12/97

(page 1 of 3)

**EXHIBIT**
**2a**

☐ **General Intangibles:** All general inter... ss inclu... but not limited to, tax refunds... plications for patents,... s. copyrights, trademarks, trade secrets, good will, ... names, ... tomer lists, permits and franchise... d the right to use my name.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, or other benefits (including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance payments, diversion payments, and conservation reserve payments) in which I now have and in the future may have any rights or interest and which arise under or as a result of any preexisting, current or future Federal or state government program (including, but not limited to, all programs administered by the Commodity Credit Corporation and the ASCS).

☒ The secured property includes, but is not limited by, the following:

ASSIGNMENT OF CONTRACT FROM THE BROWNDREW GROUP, INC. IN THE AMOUNT OF
$1,145,990.00 FOR THE CONSTRUCTION OF THE SOCIAL SECURITY ADMINISTRATION OFFICE
LOCATED AT 1735 COFFEE PORT ROAD, BROWNSVILLE, HIDALGO COUNTY, TEXAS, DATED
JUNE 04, 2001

If this agreement covers timber to be cut, minerals (including oil and gas), fixtures or crops growing or to be grown, the description of the real estate is:

_____

_____

☐ If checked, file this agreement on the real estate records. Record owner (if not me) _____

The Property will be used for a  ☐ personal  ☒ business  ☐ agricultural  ☐ _____ purpose.

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY** - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.

**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.

I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 3 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent; (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law of this security agreement.

**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.

**PAYMENTS BY LENDER** - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.

**INSURANCE** - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

**DEFAULT** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. Default shall also exist if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 CFR Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1. I agree to inform you in writing of any change of my address.

**FILING** - A carbon, photographic or other reproduction of this security agreement or the financing statement covering the Property described in this agreement may be used as a financing statement where allowed by law. Where permitted by law, you may file a financing statement which does not contain my signature, covering the Property secured by this agreement.

┌─────────────────────────────────────────────────┐
│ Any person who signs within this box does so to   │
│ give only a security interest in the Property     │
│ described on page 1 and in this box. This person  │
│ does not promise to pay the note. "I" as used in  │
│ this security agreement will include the borrower │
│ and any person who signs within this box.         │
│                                                   │
│                              Date _____  │
│                                                   │
│ Signed _____   │
└─────────────────────────────────────────────────┘

© 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 5/12/97

(page 2 of 3)

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2 ]" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Texas will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued and unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.
    "Right to receive money from you" means:
    (1) any deposit account balance I have with you;
    (2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
    (3) any repurchase agreement or other nondeposit obligation.
    "Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

    If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of the accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**DEFAULT** - I will be in default on this loan and any agreement securing this loan if any one or more of the following occurs:
    (1) I fail to perform any obligation which I have undertaken in this note or any agreement securing this note; or
    (2) you, in good faith, believe that the prospect of payment or the prospect of my performance of any other obligations under this note or any agreement securing this note is impaired.

**REMEDIES** - If I am in default on this note, you have, but are not limited to, the following remedies:
    (1) You may demand immediate payment of my debt under this note (principal, accrued unpaid interest and other accrued charges).
    (2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
    (3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
    (4) You may refuse to make advances to me or allow purchases on credit by me.
    (5) You may use any remedy you have under state or federal law.
    (6) You may make use of any remedy given to you in any agreement securing this note.

    By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
    (1) demand payment of amounts due (presentment);
    (2) obtain official certification of nonpayment (protest);
    (3) give notice that amounts due have not been paid (notice of dishonor);
    (4) give notice of intent to accelerate; or
    (5) give notice of acceleration.
    I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit to notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**CREDIT INFORMATION** - I agree and authorize you to obtain credit information about me from time to time (for example, by requesting a credit report) and to report to others your credit experience with me (such as a credit reporting agency). I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

---

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT, ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

---

**SIGNATURES:** I AGREE TO THE TERMS OF THIS NOTE AND SECURITY AGREEMENT (INCLUDING THOSE ON PAGES 1 AND 2). I have received a copy of this note and security agreement on today's date.
TRIAD BUILDERS, INC.

BY: _____          _____
ROBERT SUSEN, PRESIDENT

SIGNATURE FOR LENDER

TED P. SUNDERLAND EXECUTIVE VICE PRESIDENT

© 1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UNS-LAZ-TX  5/12/97                    *(page 3 of 3)*

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**02-0011518240**
**12/03/2001 05:00 PM**

**FILED**
TEXAS
SOS    SECRETARY OF STATE

4499210002

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

ELSA STATE BANK & TRUST CO.
WESLACO BANKING CENTER
203 E. BUSINESS 83, SUITE A
WESLACO, TX  78596

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME: **TRIAD BUILDERS, INC.**

1c. MAILING ADDRESS: **2300 W. PIKE BLVD.**  CITY: **WESLACO**  STATE: **TX**  POSTAL CODE: **78596**  COUNTRY

1d. TAX ID #: SSN OR EIN: **74-2694982**  ADD'L INFO RE ORGANIZATION DEBTOR  1e. TYPE OF ORGANIZATION: **CORPORATION**  1f. JURISDICTION OF ORGANIZATION: **TEXAS**  1g. ORGANIZATIONAL ID #, if any: ☒ NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2g. ☒ NONE

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME: **ELSA STATE BANK & TRUST CO. WESLACO BANKING CENTER**

3c. MAILING ADDRESS  CITY: **WESLACO**  STATE: **TX**  POSTAL CODE: **78596**  COUNTRY

4. This FINANCING STATEMENT covers the following collateral:

ASSIGNMENT OF CONTRACT FROM THE BROWNDREW, LLC. GROUP, INC. IN THE AMOUNT OF
$1,145,990.00 FOR THE CONSTRUCTION OF THE SOCIAL SECURITY ADMINISTRATION OFFICE
LOCATED AT 1735 COFFEE PORT ROAD, BROWNSVILLE, CAMERON COUNTY, TEXAS, DATED
JUNE 04, 2001.

**EXHIBIT 2b**

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING
6. This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum (if applicable)  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (optional)  ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2
8. OPTIONAL FILER REFERENCE DATA

Bankers Systems, Inc., St. Cloud, MN Form UCC-1-LAZ. 9/13/2000

| | | |
|---|---|---|
| TRIAD BUILDERS, INC.<br>2300 W. PIKE BLVD., SUITE 204<br>WESLACO, TX 78596 | ELSA STATE BANK & TRUST CO.<br>WESLACO BANKING CENTER<br>203 E. BUSINESS 83, SUITE A<br>WESLACO TX 78596 | 1118323 74<br>Loan Number __111832374__<br>Date __Feb 26, 2002__<br>Maturity Date May 28, 2002<br>Loan Amount $ __103,686.59__<br>Renewal Of __111832373__ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of
ONE HUNDRED THREE THOUSAND SIX HUNDRED EIGHTY SIX and 59/100 _____ Dollars $ _____ 103,686.59 _____

☒ Single Advance: I will receive all of this principal sum on __02/26/2002__ . No additional advances are contemplated under this note.
☐ Multiple Advance: The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ N/A _____ and future principal advances are contemplated.
Conditions: The conditions for future advances are _____

☐ Open End Credit: You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all
other conditions and expires on _____ .
☐ Closed End Credit: You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.
INTEREST: I agree to pay interest on the outstanding principal balance from __February 26, 2002__ at the rate of __12.50__ %
per year until __May 28, 2002__
☐ Variable Rate: This rate may change as stated below.
☐ Index Rate: The future rate will be _N/A_ the following index rate: _____
__N/A__

☐ Ceiling Rate: The interest rate ceiling for this note is the _____ ceiling rate announced by the Credit Commissioner from time to time.
☐ Frequency and Timing: The rate on this note may change as often as _____
A change in the interest rate will take effect _____
☐ Limitations: During the term of this loan, the applicable annual interest rate will not be more than __N/A__ % or less than
__N/A__ %. The rate may not change more than __N/A__ % each __N/A__ .
Effect of Variable Rate: A change in the interest rate will have the following effect on the payments:
☐ The amount of each scheduled payment will change.     ☐ The amount of the final payment will change.
☐ _____

ACCRUAL METHOD: Interest will be calculated on a __actual/360 day__ basis.
POST MATURITY RATE: I agree to pay interest on the unpaid balance owing after maturity, and until paid in full, as stated below:
☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
☐ at a rate equal to _____
☐ LATE CHARGE: If a payment is made more than _____days after it is due, I agree to pay a late charge of _____

☐ ADDITIONAL CHARGES: In addition to interest, I agree to pay the following charges which ☐ are ☐ are not  included in the principal
amount above: _____
PAYMENTS: I agree to pay this note as follows:
☒ Interest: I agree to pay accrued interest **with the principal at Maturity, May 28, 2002.**

☒ Principal: I agree to pay the principal __at Maturity, May 28, 2002,__

☐ Installments: I agree to pay this note in _____ payments. The first payment will be in the amount of $ _____
and will be due _____ . A payment of $ _____ will be due _____
_____ thereafter. The final payment of the entire
unpaid balance of principal and interest will be due _____
PURPOSE: The purpose of this loan is __RENEWAL__
ADDITIONAL TERMS:

*RENEWED*
SEP 0 4 2002
*RENEWED*
ELSA STATE BANK & TRUST CO.
WESLACO, TEXAS

**SECURITY**

SECURITY INTEREST: I give you a security interest in all of the Property described below that I own or have sufficient rights in which to
transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property.
"Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of
title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon
the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections
and distributions on account of the Property.

☒ Accounts and Other Rights to Payment: All rights to payment, whether or not earned by performance, including, but not limited to,
payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens)
which I have by law or agreement against any account debtor or obligor.

☐ Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are
raw materials, work in process, or materials used or consumed in my business.

☐ Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm
machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment
described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☐ Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings or records
that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

UNIVERSAL NOTE AND SECURITY AGREEMENT
Experts © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 1/19/2001

*(page 1 of 3)*

**EXHIBIT**
**2c**

☐ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, parts and applications for patents, copyrights, trademarks, trade secrets, goodwill, the names, customer lists, permits and franchise payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

☐ **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☐ **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☐ **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☐ **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☒ **Specific Property Description:** The Property includes, but is not limited by the following:
ALL RIGHTS TO PAYMENT, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, BUT NOT LIMITED TO, PAYMENT FOR PROPERTY OR SERVICES SOLD, LEASED, RENTED, LICENSED, OR ASSIGNED. THIS INCLUDES ANY RIGHTS AND INTERESTS (INCLUDING ALL LIENS) WHICH I HAVE BY LAW OR AGREEMENT AGAINST ANY ACCOUNT DEBTOR OR OBLIGOR, INCLUDING, BUT NOT LIMITED TO, ASSIGNMENT OF CONTRACT FROM THE BROWNDREW GROUP, INC. IN THE AMOUNT OF $1,145,990.00 FOR THE CONSTRUCTION OF THE SOCIAL SECURITY ADMINISTRATION OFFICE LOCATED AT 1735 COFFEE PORT ROAD, BROWNSVILLE, HIDALGO COUNTY, TEXAS DATED JUNE 04, 2001.

If this agreement covers timber to be cut, enter real estate description and record owner information: _____
_____
_____

The Property will be used for a ☐ personal ☒ business ☐ agricultural ☐ _____ purpose.
Borrower/Owner State of organization/registration (if applicable) _____

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY** - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.
**NAME AND LOCATION** - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.
**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.
I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time, I will prepare any report or accounting you request, which deals with the Property.
I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 3 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.
I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in other states, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.
You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent; (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.
I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.
If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law of this security agreement.

**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.
**PAYMENTS BY LENDER** - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.
**INSURANCE** - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you live. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.
**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.
If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

┌────────────────────────────────────────┐
│ Any person who signs within this box does so to give you a security │
│ interest in the Property described on page 1 and this page. This │
│ person does not promise to pay the note. "I" as used in this security │
│ agreement will include the borrower and any person who signs within │
│ this box. │
│ │
│ Date_____ │
│ │
│ Signed _____ │
└────────────────────────────────────────┘

Exß̄erß̄ © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 1/19/2001

If this agreement covers farm products I will provide you your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**DEFAULT** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. Default shall also exist if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 CFR Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

**PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2, "☒" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Texas will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued and unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal.

If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of the accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**DEFAULT** - I will be in default on this loan and any agreement securing this loan if any one or more of the following occurs:
(1) I fail to perform any obligation which I have undertaken in this note or any agreement securing this note; or
(2) you, in good faith, believe that the prospect of payment or the prospect of my performance of any other obligations under this note or any agreement securing this note is impaired.

**REMEDIES** - If I am in default on this note, you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of my debt under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest);
(3) give notice that amounts due have not been paid (notice of dishonor);
(4) give notice of intent to accelerate; or
(5) give notice of acceleration.
I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit to notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

RENEWED
SEP 10 2002
WETMORE & ASSOCIATES

---

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

---

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE AND SECURITY AGREEMENT (INCLUDING THOSE ON PAGES 1 AND 2). I have received a copy of this note and security agreement on today's date.**

TRIAD BUILDERS, INC.

BY: _____           _____
ROBERT SUSEN, PRESIDENT
SIGNATURE FOR LENDER

| | | |
|---|---|---|
| TRIAD BUILDERS, INC.<br>306 S. ILLINOIS<br>MERCEDES, TX 78570 | ELSA STATE BANK & TRUST CO.<br>WESLACO BANKING CENTER<br>203 E. BUSINESS 83, SUITE A<br>WESLACO TX 78596 | 1118323 76<br>Loan Number __111832376__<br>Date __Oct 03, 2002__<br>Maturity Date __Mar 18, 2003__<br>Loan Amount $ __89,892.34__<br>Renewal Of __111832374__ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of _____

EIGHTY NINE THOUSAND EIGHT HUNDRED NINETY TWO AND 34/100 _____ Dollars $ _____ 89,892.34 _____

☒ **Single Advance:** I will receive all of this principal sum on __10/03/2002__ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____ I will receive the amount of $ _____ N/A _____ and future principal advances are contemplated.

    Conditions: The conditions for future advances are _____

_____

☐ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all other conditions and expires on _____

☐ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.

INTEREST: I agree to pay interest on the outstanding principal balance from __October 03, 2002__ at the rate of __10.00__ % per year until __March 18, 2003__ .

☐ **Variable Rate:** This rate may change as stated below.

    ☐ Index Rate: The future rate will be __N/A__ the following index rate: _____

    __N/A__

    ☐ Ceiling Rate: The interest rate ceiling for this note is the _____ ceiling rate announced by the Credit Commissioner from time to time.

    ☐ Frequency and Timing: The rate on this note may change as often as _____

        A change in the interest rate will take effect _____

    ☐ Limitations: During the term of this loan, the applicable annual interest rate will not be more than __N/A__ % or less than __N/A__ %. The rate may not change more than __N/A__ % each __N/A__

    Effect of Variable Rate: A change in the interest rate will have the following effect on the payments:

    ☐ The amount of each scheduled payment will change.    ☐ The amount of the final payment will change.

    ☐

ACCRUAL METHOD: Interest will be calculated on a _____ **actual/360 day** _____ basis.

POST MATURITY RATE: I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:

    ☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).

    ☒ at a rate equal to __EIGHTEEN PERCENT PER ANNUM__

☒ LATE CHARGE: If a payment is made more than __10__ days after it is due, I agree to pay a late charge of __5%__

☐ ADDITIONAL CHARGES: In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount above: _____

PAYMENTS: I agree to pay this note as follows:

☐ Interest: I agree to pay accrued interest _____

_____

☐ Principal: I agree to pay the principal _____

☒ Installments: I agree to pay this note in __6__ payments. The first payment will be in the amount of $ __5,000.00__ and will be due __October 18, 2002__ . A payment of $ __5,000.00__ will be due __each month__ thereafter. The final payment of the entire unpaid balance of principal and interest will be due __March 18, 2003__

PURPOSE: The purpose of this loan is __PARTIAL RENEWAL__

ADDITIONAL TERMS:

## SECURITY

**SECURITY INTEREST:** I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

☒ **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor.

☐ **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☐ **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☐ **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

UNIVERSAL NOTE AND SECURITY AGREEMENT        *(page 1 of 3)*

Express © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 1/19/2001

**EXHIBIT**

**2-d**

☐ **General Intangibles:** All general intangib'' s includi   t not limited to, tax refunds, pr   ts and applications for ¡   s, copyrights, trademarks, trade secrets, goodwill, t     names,       omer lists, permits and franchise      yment intangibles, comp    . programs and all supporting information provided in cu  ection with a transaction relating to computer p  grams, and the right to use my name.

☐ **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☐ **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☐ **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☐ **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☒ **Specific Property Description:** The Property includes, but is not limited by, the following:
ALL RIGHTS TO PAYMENT, WHETHER OR NOT EARNED BY PERFORMANCE, INCLUDING, BUT NOT LIMITED TO, PAYMENT FOR PROPERTY OR SERVICES SOLD, LEASED, RENTED, LICENSED, OR ASSIGNED. THIS INCLUDES ANY RIGHTS AND INTERESTS (INCLUDING ALL LIENS) WHICH I HAVE BY LAW OR AGREEMENT AGAINST ANY ACCOUNT DEBTOR OR OBLIGOR, INCLUDING, BUT NOT LIMITED TO, ASSIGNMENT OF CONTRACT FROM THE BROWNDREW GROUP, INC. IN THE AMOUNT OF $1,145,990.00 FOR THE CONSTRUCTION OF THE SOCIAL SECURITY ADMINISTRATION OFFICE LOCATED AT 1735 COFFE PORT ROAD, BROWNSVILLE, CAMERON COUNTY, TEXAS DATED JUNE 04,2001.

If this agreement covers timber to be cut, enter real estate description and record owner information: _____
_____
_____
_____

The Property will be used for a   ☐ personal ☒ business ☐ agricultural ☐ _____ purpose.
Borrower/Owner State of organization/registration (if applicable) _____

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY** - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.
**NAME AND LOCATION** - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.
**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.
I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.
I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 3 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.
I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be located in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.
You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent; (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.
I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.
If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law of this security agreement.

**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all its extensions, renewals, consolidations and refinancing of such loan.
**PAYMENTS BY LENDER** - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.
**INSURANCE** - I agree to buy insurance on the Property against the risks and in the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.
**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine; I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.
If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

Any person who signs within this box does so to give you a security interest in the Property described on page 1 and this page. This person does not promise to pay the note. "I" as used in this security agreement will include the borrower and any person who signs within this box.

Date _____

Signed _____

*(page 2 of 3)*

If this agreement covers farm products I - ''ll provide  at your request, a written list of the buyers, commi       mercha       selling agents to or through whom I may sell my f...  products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or the proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**DEFAULT** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. Default shall also exist if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 CFR Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

**PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2, "⊠" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Texas will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued and unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal.

If this is closed end     fit, repaying a part of th      cipal will not entitle me to addition      dit.

**SET-OFF** - I agree tha.  .ou may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of the accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**DEFAULT** - I will be in default on this loan and any agreement securing this loan if any one or more of the following occurs:
(1) I fail to perform any obligation which I have undertaken in this note or any agreement securing this note; or
(2) you, in good faith, believe that the prospect of payment or the prospect of my performance of any other obligations under this note or any agreement securing this note is impaired.

**REMEDIES** - If I am in default on this note, you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of my debt under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest);
(3) give notice that amounts due have not been paid (notice of dishonor);
(4) give notice of intent to accelerate; or
(5) give notice of acceleration.

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit to notice and for any term without affecting my liability for payment of the note. I will not assign any obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

---

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT, ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

---

SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE AND SECURITY AGREEMENT (INCLUDING THOSE ON PAGES 1 AND 2). I have received a copy of this note and security agreement on today's date.

TRIAD BUILDERS, INC.

BY:
ROBERT SUSAN, PRESIDENT
SIGNATURE FOR LENDER

TED P. SUNDERLAND EXECUTIVE VICE PRESIDENT

Experian © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ-TX 1/19/2001

00025138

## AFFIDAVIT OF COMPLETION

J. MICHAEL DREW, President of The Drew Group, Inc., Manager of BROWNDREW, LLC, appeared personally before me, the undersigned authority, and, upon oath, deposed and stated:

My name is J. Michael Drew, and I am President of The Drew Group, Inc., Manager of BROWNDREW, LLC. My address is 656 West Randolph, Suite 400W, Chicago, IL 60661. I have personal knowledge of the facts set forth below and am competent to make this affidavit, and am authorized to do so on behalf of BROWNDREW, LLC.

BROWNDREW, LLC, as Owner, entered into a contract for the construction of improvements to real property, which contract is more particularly described as follows:

**Date:  June 4, 2001**
**Name and Address of Contractor:**      Triad Construction, Inc.
                                         2300 W. Pike Blvd. Suite 204
                                         Weslaco, TX 78596

**Description of Improvements/Construction:**  Construction of GSA Building and related infrastructure.

**Legal Description of Property:**  Lot 2, Block 1, HAPCO Subdivision, a Subdivision in Cameron County, Texas, according to the Plat of said Subdivision recorded in Cabinet 1, Page 118-B, Map Records, Cameron County, Texas, also known as Lots 1 and 2, GSA Subdivision, according to Plat thereof recorded in the Map Records of Cameron County, Texas.

The specified improvements were completed on March 18, 2002.

**A CLAIMANT MAY NOT HAVE A LIEN ON RETAINED FUNDS UNLESS THE CLAIMANT FILES AN AFFIDAVIT CLAIMING A LIEN NO LATER THAN THIRTY DAYS AFTER THE DATE OF COMPLETION ESTABLISHED BY THIS AFFIDAVIT.**

BROWNDREW, LLC, Owner
By: The Drew Group, Inc., Manager

By:
J. Michael Drew, President

Subscribed and sworn to before me on this the ____7 th____ day of May, 2002.

Notary Public in and for the State of Illinois.

"OFFICIAL SEAL"
KAREN M. DIVENERE
COMMISSION EXPIRES 06/18/04

EXHIBIT
3

A CERTIFIED COPY

Attest November 5, 20 02.
JOE G. RIVERA, County Clerk
Cameron County, Texas

By _____ Deputy

Doc                Bk     Vol        Pg
00025138  OR   7987    234

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: May 08,2002   at   04:31P

Document Number:          00025138

        By
Lorena Garcia
Joe G Rivera, County Clerk
Cameron County

State of Texas
County of Cameron

I, Joe G. Rivera, County Clerk of
Cameron County, Texas, do hereby certify
that the foregoing is a true and correct
copy of the original record now on file
and/or recorded by me in the _____
_____ Records, Volume _____
page(s) 233-234
_____ Date
JOE G. RIVERA, COUNTY CLERK
Cameron County, Texas

By _____ Deputy

Oct.21. 2002 12:15PM     REY RO FAULK BLAKEMORE                        No.0267   P. 3/30

# SWORN STATEMENT

1. **THE NATURE OF THE LABOR:** Assemble and installed 17 sets if sliding doors per Triad specifications ( see invoice #798736).

2. **LABOR PROVIDED ON:** Initial estimate was done on November 28, 2001 and changes to work requested were made on December 04, 2001 and again on December 07, 2001. Order was approved and started on January 10, 2002 and completed January 18, 2002.

3. **LAST DATE WHEN PROVIDED LABOR.** On February 15, 2001 an additional order for weather stripping was made. This was to cover openings on each side of sliding doors, but not directly related to sliders (see attached work orders).
   On March 13, 2002 we went to install laminated safety glass in two offices, not at all related to sliding doors (see invoice 301053).
   On March 15, 2002 another work order was generated to adapt sliding doors to meet customers new request and to make a mailbox.

4. **AMOUNT UNPAID:** The remaining balance for all work orders requested is $1802.73. This does not include any late fees or interest; which normally accrues on late payment invoices (approximately $ 150.00 dollars extra for outstanding amount).

5. **NON-PAYMENT NOTICE DATES.** We send outstanding balances at the end of each month (see copies).

6. **NON-PAYMENT NOTICE TO BROWNDREW, LCC:** We did not ever bill Browndrew directly as we were contracted by Triad. I did speak with them on two occasions. When they needed additional keys for locks and when they had one sliding door not functioning correctly.

7. **DATE WHEN FILED A LIEN:** Did not file lien

8. **CHANGES TO INCREASE CLAIM FROM ORIGINAL APPROVED AMOUNT:** See invoices listed on #3
   Invoice # 301053 dated 3-13-02
   Invoice # 301061 dated 3-15-02
   Job dated 2-15-02

I, Robert Serna swear that all the information stated above is true.

Robert Serna

EXHIBIT
4

Oct. 21. 2002 12:16PM — RE___RG-FAUER-BLACKMORE --

| | | |
|---|---|---|
| **BEN'S GLASS AND METAL** | **INVOICE#** | **796736** |
| **1125-A E. 13TH STREET** | | |
| **BROWNSVILLE TX 78520** | **DATE** | **1/18/2002** |
| **(956)546-1236** | | |

| NAME | TRIAD BUILDERS | SANTOS HERNANDEZ |
|---|---|---|
| ADDRESS | | |
| CITY,STATE,ZIP | BROWNSVILLE, TEXAS | |
| PHONE NUMBER | 605-4235 OR 838-4235 | |

| ORDER NO. QUANTITY | SOLD BY | DESCRIPTION | CASH | CHARGE | C.O.D. | ON ACCT. UNIT PRICE | PAID OUT AMOUNT |
|---|---|---|---|---|---|---|---|
| 17 | | SLIDER ASSEMBLY WITH DOUBLE DOOR (18X36), FORMICA COVERED WILSONART D47-6 MOCCASIN COLOR DIMENSIONS VARY SLIGHTLY, WILL ADJUST TO FIT PROPERLY | | | | 161.31 | 2742.27 |
| 17 | | INSTALLATION CHARGE PER SET | | | | 20.00 | 340.00 |
| | | NITE LOCK PINS. FOR LOCKING SLIDING WINDOW FROM INSIDE (WILL BE REPLACED BY REG. LOCKS) | | | | 2.50 | 42.50 |
| 17 | | REGULAR LOCKS 8.95 X 17 = 152.15 152.15 - 42.50 = 109.65 | | | | | 109.65 |
| | | | | | SUB-TOTAL | | 3234.42 |
| RECEIVED BY: | | | | | TAX | | 266.84 |
| | | | | | TOTAL | | 3501.26 |

Did not chg ____ Locks ____ ____ to lost keys
by TRIAD

Oct-91, 2009 19:57PM   BEN'S GLASS BLAKEMORE                    No.0267   P. 5/30

| BEN'S GLASS AND METAL<br>1125-A E. 13TH STREET<br>BROWNSVILLE TX 78520<br>(956)546-1236 | | | INVOICE#<br><br>DATE        2/15/2002 | | | | |
|---|---|---|---|---|---|---|---|
| **NAME** | | TRIAD BUILDERS      SANTOS HERNANDEZ | | | | | |
| **ADDRESS** | | | | | | | |
| **CITY & NUMBER** | | BROWNSVILLE TEXAS | | | | | |
| ORDER NO. | SOLD BY | | CASH | CHARGE | C.O.D. | ON ACCT. | PAID OUT |
| QUANTITY | DESCRIPTION | | | | UNIT PRICE | | AMOUNT |
| 34 | WEATHER STRIPPING FOR EACH SLIDER | | | | $  4.95 | | $  168.30 |
| | LABOR TO INSTALLATION WEATHER STRIP | | | | $  100.00 | | $  100.00 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | SUB TOTAL | | $  268.30 |
| RECEIVED<br>BY: | | | | | TAX | | $  22.13 |
| | | | | | TOTAL | | $  290.43 |

Approved by Santos
3/6/02

X 2
580.86



Oct.21. 2002 12:17PM    ROGERO FAULK BLAKEMORE    No.0267    P. 7/30

Ben's Glass and Metal
1125-A  E. 13th Street
Brownsville, Tx 78521

# STATEMENT

| Date |
|------|
| 01/31/02 |

TO:

TRIAD BUILDERS

| Amount Due | Amount Enclosed |
|------------|-----------------|
| $3,501.26 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 01/18/02 | INVOICE # 301053 | 3,501.26 | $ 3,501.26 |

**NOTE:**
   IF YOU ARE TAX EXEMPT PLEASE
   SEND A COPY OF THE TAX EXEMPT
   FORM.


THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30-Days | Past Due 60-Days | Past Due 90-Days | Amount Due |
|---------|------------------|------------------|------------------|------------|
| 3,501.26 | | | | $ 3,501.26 |

Oct.21. 2002 12:19PM   PENRO FAULK BLAKEMORE          No.0267   P. 9/30

Ben's Glass and Metal
1125-A  E. 13th Street
Brownsville, Tx 78521

# STATEMENT

| Date |
|------|
| 02/20/02 |

TO:

TRIAD BUILDERS

| Amount Due | Amount Enclosed |
|------------|-----------------|
| $3,501.26 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 01/18/02 | INVOICE # 301053 | 3,501.26 | $ 3,501.26 |

**NOTE:**
   IF YOU ARE TAX EXEMPT PLEASE
   SEND A COPY OF THE TAX EXEMPT
   FORM.

THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30-Days | Past Due 60-Days | Past Due 90-Days | Amount Due |
|---------|------------------|------------------|------------------|------------|
| | $ 3,501.26 | | | $ 3,501.26 |

Oct.21. 2002 12:18PM    RE... TO FAULK BLAKEMORE                 No.0267    P. 9/30

**PMorganChase**
JPMorgan ... se Bank
P O BOX .
Mail Station 17 TCC 48
HOUSTON, TEXAS 77252-8048

Date 02/01/22
Our Ref. (TRN) NO. 023051802ZZT
Please mention our Reference No. (TRN) in any correspondence.
Originator's Data 02/01/22
Related Ref. No. BN020122040753

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO 236846809565
FOR PAYMENT INDICATED    SAME DAY FUNDS

RECEIVED FROM
/5330061962

| $2,738.30** |

GUARANTY NATIONAL TITLE CO
CHICAGO IL USA60602

ORDERING BANK
AMERICAN NATIONAL BANK TRUST CO CHI
33 NORTH LA SALLE
CHICAGO IL 60498

ROBERT SERRA DBA BEN'S CLASS & META
1844 PALM BLVD
BROWNSVILLE TX 70521

IMAD:0122 G1QH050C 000483
OMAD:0122 K3QF381C 002305

DETAILS OF PAYMENT
NOTIFY ELIZABETH 956 546-1236 GNT
#C01-0507-6

Oct.21. 2002 12:13PM    PE   RO FAULK BLAKEMORE                    No.5267    P. 10/30

**Ben's Glass and Metal**
**1125-A E. 13th Street**
**Browneville, Tx 78521**

# STATEMENT

| Date |
|---|
| 03/27/02 |

TO:

TRIAD BUILDERS

| Amount Due | Amount Enclosed |
|---|---|
| $   1,802.73 | |

| Date | Transaction | Amount | Balance |
|---|---|---|---|
| 03/13/02 | INVOICE # 301053 | 340.78 | $   240.78 |
| 02/15/02 | INVOICE # 301051 | 799.99 | $ 4,000.77 |
| 01/18/02 | INVOICE # 798736 | 3,501.26 | $ 4,541.03 |
| | TOTAL FOR ALL JOBS | | $ 4,541.03 |
| | PARTIAL WAIVER PAYMENT ON INVOICE # 798736 | | $ 2,738.30 |
| | BALANCE DUE | | $ 1,802.73 |

NOTE:
     IF YOU ARE TAX EXEMPT PLEASE
     SEND A COPY OF THE TAX EXEMPT
     FORM. IF YOU DEDUCT TAXES
     FROM EACH INVOICE YOUR NEW
     TOTAL SHOULD BE $ 1456.65

THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30 Days | Past Due 60 Days | Past Due 90 Days | Amount Due |
|---|---|---|---|---|
| 1,802.73 | | | | $ 1,802.73 |

OCT-21-2002 12:43PM    REY-? TAULK BLAKEMORE    No.0207    P.11/30

**Ben's Glass and Metal**
1125-A E. 13th Street
Brownsville, Tx 78521

## STATEMENT

| Date |
|------|
| 04/26/02 |

| TO: |
|-----|
| TRIAD BUILDERS |

| Amount Due — | Amount Enclosed |
|---|---|
| $ 1,802.73 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 03/01/02 | INVOICE # 301060 | 240.70 | $ 240.70 |
| 03/15/02 | INVOICE # 301061 | 798.99 | $ 1,039.77 |
| 01/18/02 | INVOICE # 798736 | 3,501.26 | $ 4,541.03 |
| | TOTAL FOR ALL JOBS | | $ 4,541.03 |
| | PARTIAL WAIVER PAYMENT ON INVOICE # 798736 | | $ 2,738.30 |
| | **BALANCE DUE** | | **$ 1,802.73** |

NOTE:
IF YOU ARE TAX EXEMPT PLEASE
SEND A COPY OF THE TAX EXEMPT
FORM.  IF YOU DEDUCT TAXES
FROM EACH INVOICE  YOUR NEW
TOTAL SHOULD BE $ 1456.65

THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30-Days | Past Due 60-Days | Past Due 90-Days | Amount Due |
|---------|------------------|------------------|------------------|------------|
| | $ 1,802.73 | | | $ 1,802.73 |

Oct-21. 2002 12:13PM    REM TO FAULK BLAKEMORE                    No.0207   P. 12/30

Ben's Glass and Metal
1125-A  E. 13th Street
Brownsville, Tx 78521

**STATEMENT**

| Date |
|------|
| 05/27/02 |

TO:

TRIAD BUILDERS

| Amount Due | Amount Enclosed |
|------------|-----------------|
| $1,802.73  |                 |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 03/13/02 | INVOICE # 301053 | 240.78 | $  240.78 |
| 03/15/02 | INVOICE # 301061 | 798.99 | $ 1,039.77 |
| 01/18/02 | INVOICE # 798736 | 3,501.26 | $ 4,541.03 |
|  | TOTAL FOR ALL JOBS |  | $ 4,541.03 |
|  | PARTIAL WAIVER PAYMENT ON INVOICE # 798736 |  | $ 2,738.30 |
|  | **BALANCE DUE** |  | $ 1,802.73 |

NOTE:
   IF YOU ARE TAX EXEMPT PLEASE
   SEND A COPY OF THE TAX EXEMPT
   FORM.  IF YOU DEDUCT TAXES
   FROM EACH INVOICE  YOUR NEW
   TOTAL SHOULD BE $ 1456.65

THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30-Days | Past Due 60-Days | Past Due 90-Days | Amount Due |
|---------|------------------|------------------|------------------|------------|
|  |  | $ 1,802.73 |  | $ 1,802.73 |

Oct.21. 2002 12:19PM   R? FRO FAULK BLAKEMORE                    No.0267   P. 13/30

Ben's Glass and Metal
1125-A  E. 13th Street
Brownsville, Tx 78521

# STATEMENT

| Date |
|------|
| 06/28/02 |

TO:

TRIAD BUILDERS

| Amount Due | Amount Enclosed |
|------------|-----------------|
| $1,802.73 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 03/13/02 | INVOICE # 301053 | 240.78 | $   240.78 |
| 03/15/02 | INVOICE # 301061 | 798.99 | $ 1,039.77 |
| 01/18/02 | INVOICE # 798736 | 3,501.26 | $ 4,541.03 |
| | TOTAL FOR ALL JOBS | | $ 4,541.03 |
| | PARTIAL WAIVER RELEASE ON INVOICE # 798736 | | $ 2,738.30 |
| | BALANCE DUE | | $ 1,802.73 |

NOTE:
 IF YOU ARE TAX EXEMPT PLEASE
 SEND A COPY OF THE TAX EXEMPT
 FORM.  IF YOU DEDUCT TAXES
 FROM EACH INVOICE  YOUR NEW
 TOTAL SHOULD BE $ 1456.65

THANK YOU FOR YOUR BUSINESS

| Current | Past Due 30-Days | Past Due 60-Days | Past Due 90-Days | Amount Due |
|---------|------------------|------------------|------------------|------------|
| | | | 1,802.73 | $ 1,802.73 |

Oct.21. 2002 12:21PM   REN   O FAULK BLAKEMORE                    No.0267   P. 18/30

# D & B

## GENERAL CLEANING CONTRACTOR

P.O. BOX 8551
BROWNSVILLE, TEXAS 78526
(956) 504-5373

October 18, 2002

RENTERO, FAULK & BLAKEMORE, LLP
ATTORNEYS COUNSELORS AND MEDIATORS
185 E RUBEN M TORRES SR BLVD
BROWNSVILLE TX   78520

ATTN:   WILLIAM L RENTFRO

RE:   BROWNDREW V. TRIAD, ET AL.
      CASE NO. B-02-137

Dear Mr. Rentfro:

This acknowledges receipt of your letter dated October 4, 2002.

In response to your letter, and per your request, we are forwarding
you my sworn statement, setting out the information as indicated in
your letter.  Attached to the sworn statement, you will also find
pertaining documentation.

We Thank You for your attention to this matter, and await your
response regarding the date, time, and location of a court ordered
mediation.

If you have any questions, please contact the undersigned.

Sincerely,

David K. Solis
Owner

RECEIVED
BY            DATE

EXHIBIT
5

Oct.21. 2002 12:22PM    R   FRO FAULK BLAKEMORE                              No.0267   P. 19/30

SWORN STATEMENT
OF DAVID K SOLIS
D & B GENERAL CLEANING CONTRACTOR

RE:   CONSTRUCTION CLEAN-UP AT SOCIAL SECURITY BUILDING

On or about 03-08-02, we were hired by Thearl C. Adams, with Triad
Builders, to perform the construction clean up at the GSA Building
(Social  Security  Building),  located  at  1735  Coffeport  Road,
Brownsville, Tx.  Attached is a copy of the agreed proposal.

It was agreed between D & B General Cleaning Contractor and Triad
Builders,  that  for  the  sum  of  $900.,  D  &  B  General  Cleaning
Contractor would: Sweep and mop hard surface floors; apply two coats
of floor finish to VCT tile; vacuum carpeted areas; clean restrooms;
Wash windows inside & out; Dust baseboards, doors, door frames, and
window ledges; Dust A/C vents, venetian blinds and light fixtures;
and provide paper products (restrooms items) for one day usage.

On or about 03-14-02, our work was completed, except for vacuuming
and applying floor finish.  The vacuuming and floor finish was not
completed because subcontractors were still in the building. We
returned  that  same  evening  to  complete  our  task,  but  other
sub-contractors were still in the building.  At that point, we were
unable to complete our vacuuming and floor finish, but we were
forced  to  clean  areas  which  had  already  been  cleaned,  as  the
subcontractors had performed additional construction and created a
mess.  We returned on the morning of 03-15-02, but again encountered
a delay due to other subcontractors. At that point, we halted our
services per Triad's on-site foreman, Santos.  Attached is a copy of
our letter to Thearl Adams, dated 03-15-02.  On or about 03-18-02,
we contacted Thearl Adams regarding the remaining vacuuming and
floor finish.  He agreed the vacuuming and floor finish would be
completed once all construction was finished.  Attached is a copy of
our letter to him dated 03-18-02. The vacuuming was completed on the
evening of 03-18-02, and floor finish was completed 03-19-02.

We  communicated  with  Santos  and  Sandra  Echavarria  with  Triad
Builders, Inc.  Our $900. invoice #2487, which is enclosed, was
mailed and faxed to them, or about 03-20-02.  After several calls
with no response, regarding payment status, we mailed our invoice to
Triad Builders by certified mail on 05-08-02.  Attached is our
returned  signed  receipt  indicating  our  invoice  was  received  by
Sandra Echavaria on 05-09-02.

Sworn Statement
of David K. Solis
Page -2-

On or about 05-22-02, we responded to Tom Boucher's (Browndrew, LLC), letter dated May 16, 2002 regarding subcontract work by Triad Builders, Inc. Enclosed is a copy of our letter to Browndrew, LLC., dated 05-22-02, and a copy of their letter dated 05-16-02.

We are a small operation, and we estimate we have over $900. invested in this matter. However, at this point, our claim is for only the original agreed amount of $900. No lien was filed on our behalf, against the property.

It is our understanding that Triad Builders, Inc., Browndrew, LLC,, and Carotex Properties, Inc., are all in agreement that D & B General Cleaning completed the construction clean-up job which was contracted to do. In fact, we presently provide janitorial service at that same location for Carotex Properties, Inc.

I certify that the above sworn statement is true and correct, to the best of my knowledge.

David K. Solis
Owner, D & B General Cleaning Contractor.


STATE OF: Texas

COUNTY OF: Cameron


On the 18th day of October, 2002 before me personally appeared David K. Solis to me known to be the person named herein and who acknowledged to me that this is his Sworn Statement.

My term expires: 11-18-2003

MA. GUADALUPE MARTINEZ
Notary Public, State of Texas
My Commission Expires 11-18-2003

Notary Public

# D & B

## GENERAL CLEANING CONTRACTOR

P.O. BOX 8551
BROWNSVILLE, TEXAS 78526
(956) 504-5373

March 8, 2002

Triad Builders, Inc.
2300 W. Pike Blvd., Ste 204
Weslaco, TX. 78596

Attn:   Thearl C. Adams
        Project Manager

Dear Mr. Adams:

As per our discussion this morning regarding the construction clean-up of the new Social Security Office located at 1735 Coffee Port Rd., Brownsville, we submit the following proposal.

Services

Sweep and mop hard surface floors.
Apply two coats of floor finish to VCT tile.
Vacuum carpeted areas.
Clean restrooms (all aspects).
Wash windows inside and out.
Dust baseboards, doors, door frames and window ledges.
Wipe clean counters and other flat surfaces.
Dust a/c vents, venetian blinds and light fixtures.
Provide paper products (restroom items) for one day usage.

We agree to provide the above listed services for the one time fee of $900.00 due upon completion of service.

Upon request, we can provide a certificate of insurance.

For scheduling purposes, we will require at least 72 hour notice if our proposal is accepted.

Sincerely,

David K. Solis
Owner.

• T R I A D •
B U I L D E R S, I N C.

THEARL C. ADAMS

Oct. 21. 2002 12:23PM    RE:  R0 FAULK BLAKEMORE                    No.0267   P. 22/30

# D & B

## GENERAL CLEANING CONTRACTOR

P.O. BOX 8551
BROWNSVILLE, TEXAS 78526
(956) 504-5373

March 15, 2002

Triad Builders, Inc.
~~2300 W. Pike Blvd./Ste 204~~
Weslaco, Tx.  78596

Attn:  Thearl C. Adams
       Project Manager

Dear Mr. Adams:

Prior to our agreement to provide construction clean-up of the
~~existing community office building located at 1725 Coffee Port~~
~~Contractor) that the building in question would be ready for~~
clean-up March 14, 2002.

We completed all of the agreed upon services (except for
vacuuming the carpet and applying floor finish to the VCT tile)
on the 14 March 2002 with the understanding that we would be
able commence vacuuming and applying floor finish the afternoon
of March 14, 2002.

Needless to say, we could not commence the floor service or the
~~vacuuming, in fact, we had to re-do task that had already been~~
~~completed. Once again, we attempted to commence the floor~~
service this morning (3/15/02) but was delayed because the
~~areas in question were not completed~~

At this point, we have halted our services (with on-site Triad
supervisors approval) and we will not continue until all
contractors have completed their task.

Please keep in mind, if we are to re-do tasks that have already
be completed, there will be an additional charge.  If your
organization decides to complete the construction clean-up
themselves, we will deduct $300.00 (deduction is for not
completing the vacuuming and for not applying floor finish)
from our initial bid of $900.00.

We apologize for the inconvenience, but, keep in mind that you were made aware of the circumstances if we had to re-do our services.

David K. Solis
Owner

# D & B

## GENERAL CLEANING CONTRACTOR

P.O. BOX 8551
BROWNSVILLE, TEXAS 78526
(956) 504-5373

March 18, 2002

Triad Builders, Inc.
2300 W. Pike./Suite 204
Weslaco, Tx. 78596

Attn: Sandra Echevarria

Dear Ms. Echevarria:

This confirms my conversation this morning with Thearl (Terry) C. Adams regarding the Social Security Building located at 1735 Coffee Port Rd., Brownsville Texas.

It has been agreed between D&B General Cleaning Contractor and Triad Builders, Inc. (Thearl C. Adams) that we have completed our portion of the construction clean-up for the above noted location except for applying two coats of floor finish to the VCT tile and vacuuming.

Mr. Adams stated that we do not have to re-do the tasks that have already been completed. We agree to complete the last two items of our agreement once all construction has been completed.

To ensure that both parties are in agreement, we require confirmation from a representative with authority of the Triad Builders, Inc.

David K. Solis
Owner

Triad Builders, Inc.

By _____    Date _____

OCT-21-2002 12:24PM   REM-RO FAULK BLAKEMORE                     No.0287   P. 25/30

# D & B General Cleaning

**Invoice**

P.O. Box 8551
Brownsville, TX 78526

| DATE | INVOICE # |
|------|-----------|
| 3/20/2002 | 2487 |

| BILL TO |
|---------|
| Triad Builders, Inc.<br>2300 W. Pike Blvd., Suite #204<br>Weslaco, Texas 78596<br><br>Attn:  Sandra Echavarria |

| P.O. NO. | TERMS | PROJECT |
|----------|-------|---------|
|  | Due on receipt |  |

| QUANTITY | DESCRIPTION | RATE | AMOUNT |
|----------|-------------|------|--------|
|  | Construction clean-up performed at the Social Security Office located at 1735 Coffee Port Rd., Brownsville, Texas.<br><br>Services Provided:<br>- Sweep and mop hard surface floors<br>-  Apply two coats of floor finish to VCT tile<br>- Vacuum carpeted areas<br>-  Clean restrooms<br>- Wash windows inside & out<br>- Dust baseboards, doors, door frames and window ledges<br>   Dust A/C vents, venetian blinds and light fixtures<br>- Provide paper products (restroom items) for one day usage | 900.00 | 900.00 |

RECEIVED
BY _____ DATE _____

| Each opportunity to be of service is sincerely appreciated. | **Total** | **$900.00** |
|---|---|---|

Oct-21-2002 2:24PM   REM TO FAULK BLAKEMORE RECEIPT   No.0267   P. 25/30

*(Domestic Mail Only; No Insurance Coverage Provided)*

## O F F I C I A L   U S E

| | | |
|---|---|---|
| Postage | $ | .34 |
| Certified Fee | | 2.10 |
| Return Receipt Fee (Endorsement Required) | | 1.50 |
| Restricted Delivery Fee (Endorsement Required) | | -0- |
| Total Postage & Fees | $ | $3.94 |

Postmark Here

Sent To
Triad Builders, Inc.
or PO Box No. 2300 W. Pike Blvd. Suite 240
City, State, ZIP+4 Weslaco, Texas 78596

PS Form 3800, January 2001     See Reverse for Instructions

---

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

| A. Signature | |
|---|---|
| X Sandra Echaurria | ☐ Agent ☐ Addressee |

B. Received by (Printed Name)   C. Date of Delivery

1. Article Addressed to:

TRIAD BUILDERS, INC.
2300 W. PIKE BLVD., SUITE #240   204

WESLACO, TEXAS 70596

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7001 1140 0002 2374 5070

PS Form 3811, August 2001   Domestic Return Receipt   102595-01-M-2509

---

UNITED STATES POSTAL SERVICE   McALLEN TX 785

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

D & B GENERAL CLEANING CONTRACTOR
P.O. BOX 8551
BROWNSVILLE, TEXAS 78520

Oct.21. 2002 12:25PM     REN 0 FAULK BLAKEMORE                    No.0267    P. 27/30

# Memo

| | |
|---|---|
| **To:** | Subcontractors and Suppliers of Triad Builders, Inc. |
| **From:** | BROWNDREW, LLC |
| **Date:** | May 10, 2002 |
| **Subject:** | Claims against GSA Building on Coffeeport Road, Brownsville, Texas |

TO WHOM IT MAY CONCERN:

BROWNDREW, LLC, was the owner of the property on which the GSA Building was recently constructed on Lot 2, Block 1, HAPCO Subdivision, and on which Triad Builders, Inc. was the general contractor. That property was subsequently sold to the current owner, and leased by the current owner to the current tenant. The parties currently in possession of the property have no connection with or liability to subcontractors or suppliers regarding the construction of the building.

It has come to our attention that a number of subcontractors and suppliers may not have been paid by Triad Construction, Inc. regarding this project, and accordingly funds have been retained in accordance with the Texas Property Code retainage statutes. An Affidavit of Completion was filed in the Real Property records of Cameron County, Texas on May 8, 2002. This means that subcontractors and suppliers on this project who have not been paid in full need to file their notices of non-payment at the following address not later than June 7, 2002:

BROWNDREW, LLC
Attn: Mr. Tom Boucher
656 West Randolph, Suite 400W
Chicago, IL 60661

On or after June 8, 2002, BROWNDREW, LLC will proceed to disburse retained funds to those subcontractors or suppliers who have filed notices of non-payment in proportion to their respective claim amounts. In the meantime, claimants should be advised that contacting the current owner or tenant of the premises with regard to payment will be regarded as trespass and/or tortious interference with contractual relations. Attempts to remove improvements from the property will be regarded as conversion. Remedies for unpaid claims must be pursued as set out above, and interference with the current operation of the premises will be reported to the appropriate authorities.

Oct.21. 2002 12:25PM     REN 'O FAULK BLAKEMORE     No.0267   P. 28/30

May 22, 2002


Browndrew, LLC
656 West Randolph. Suite 400 W
Chicago, IL  60661

Attn:  Tom Boucher

Dear Sir:

In response to your correspondence dated May 16, 2002, we are
enclosing our invoice for services (construction clean-up)
provided at the GSA Building located at 1735 Coffee Port Rd.,
Brownsville Texas.

Your immediate attention to this matter would be deeply
appreciated.

Should you have any further questions concerning this or any
other matter, please do not hesitate to contact our office.

Sincerely,


David K. Solis
Owner

Oct. 21, 2002 12:20PM   REN RO FAULK BLAKEMORE                    No. 0267   P. 14/30

10/17/02

**Rentfro, Faulk, & Blakemore, LLP**
**Attorneys at law**
**185 E. Ruben Torres Blvd.**
**Brownsville, TX 785520**                    **Case Number: B-02-137**

**(956)-541-9600 (telephone)**

**(956)-541-3414 (fax)**

**Dear Sir:**

**This are the Dates we worked for Triad Builders, Inc,. At the new SS
Building on Coffee Port Road Brownsville, TX, March the 8th through
March the 20th.**

**Workers names:**

**David Lester Dunn**

**Ruben Hinojosa**

**G.D. Lozano**

G.D. Lozano

EXHIBIT
6

75

To:       BROWNDREW, LLC
        ATTN: Mr. Tom Boucher
        656 West Randolph, Suite 400W
        Chicago, IL  60661

United States District Court
Southern District of Texas
FILED

OCT 7 ℓ 2002

Michael N. Milby
Clerk of Court

From:    G.D. LOZANO
Date:     OCT. 7, 2002
Subject:  Notice of Non-Payment
Civil Case No. :  B-02-137

TO WHOM IT MAY CONCERN:

The following are the hours that my crew and I worked at the building on
Lot 2,Block 1,HAPCO Subdivision in Brownsville, Texas on which Triad
Builders, Inc. was the general contractor.

G.D. LOZANO:         83 hours
DAVID LESTER DUNN: 83 hours
RUBEN HINOJOSA:    61 hours
    Total hours worked: 227 @ $15.00 per hour
                Total: $3,405.00
Also included:
 200 sq. ft of Tile and Grid and Ceiling Tile @ $2.00 a sq. ft.
 Labor and Materials: $400.00
 Total amount due: $3,805.00


G.D. LOZANO   Tax I.D.# 329323006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BROWNDREW, L.L.C.<br>    Plaintiff,<br><br>V.<br><br>TRIAD BUILDERS, INC.; ELSA STATE<br>BANK & TRUST CO.; G & T PAVING CO.;<br>AQUA TECH; VILLANUEVA FENCE &<br>SUPPLY CO.; VALLEY BUILDERS CO.;<br>ROBERT'S WELDING & FABRICATORS,<br>INC.; BOWMAN DISTRIBUTING COMPANY<br>INC.; OMEGA SYSTEMS; GALVAN SHEET<br>METAL SHOP; RAYMOND ROOFING, INC.;<br>EDMANN'S COMMERCIAL REFRIGER-<br>ATION & A/C; SKIPPER'S REPAIR<br>PLUMBING; RZB INC., d/b/a GLOBAL<br>ELECTRIC; LIFETIME INDUSTRIES;<br>BEN'S GLASS AND METAL; KENMARK,<br>INC.; GABRIEL ALCANTAR; ALFREDO<br>GUTIERREZ; M&M COMMERCIAL LAWN<br>SERVICES, INC.; G.D. LOZANO; KEVIN<br>COMIER; JCO SPECIALISTS; OPENING<br>SPECIALTIES AND SUPPLY, INC.; DAL-<br>TILE CORPORATION; DEA SPECIALTIES<br>CO., LTD.; LCM MANAGEMENT CO., INC.<br>d/b/a SOUTH TEXAS FLAG; STAR BUILDING<br>SYSTEMS; MARIO MARON; D&B GENERAL<br>CLEANING; G.T. BLINDS, INC.; ROBERT<br>MARISCAL; THE SHERWIN-WILLIAMS<br>COMPANY; THE STRIPING COMPANY;<br>ROBERTO GOMEZ; A&J PAVING; HOPE<br>LUMBER & SUPPLY CO., L.P.; CONSOL-<br>IDATED ELECTRIC DISTRIBUTORS, INC.;<br>PALMVIEW GLASS & MIRROR, INC.; and<br>FINANCIAL INVESTMENTS, INC.,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br>B-02-137<br><br>**JURY** |

**ORDER ON ELSA STATE BANK'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

After considering defendant ELSA STATE BANK's motion for partial summary

judgment, the response, and all other evidence on file, and after a hearing, the court

FINDS there is no genuine issue of material fact.  Therefore, the court GRANTS the

motion and finds that ELSA STATE BANK is a secured creditor and is entitled to priority

of payment of the interplead funds over EDMANN'S COMMERCIAL REFRIGERATION

AND A/C, ROBERTO CARDENAS, JR., D/B/A ROBERT'S WELDING & FABRICATORS,

INC., LIFETIME INDUSTRIES, INC., ROBERT SERRA, D/B/A BEN'S GLASS & METAL,

D&B GENERAL CLEANING CONTRACTOR, AQUA TECH, G.D. LOZANO, OPENING

SPECIALIST AND SUPPLY, INC., ENCINAL INVESTMENTS, INC., ASSIGNEE OF

CLAIMANT PALMVIEW GLASS AND MIRROR, GABRIEL ALCANTAR, G&T PAVING

CO., A SOLE PROPRIETOR, BOWMAN DISTRIBUTING COMPANY, INC. and LCM

MANAGEMENT CO., INC., all of which are unsecured claimants.

SIGNED on _____, 2002.

_____
U.S. DISTRICT JUDGE

APPROVED & ENTRY REQUESTED:

_____
LANCE A. KIRBY
Federal I.D No.: 21811
State Bar No.: 00794096
TERRY D. KEY
Federal I.D. No.: 1205
State Bar No.: 11370200
JONES, GALLIGAN, KEY & LOZANO, L.L.P.
Town Center Tower, Suite 300
2300 West Pike Boulevard
Post Office Drawer 1247
Weslaco, Texas 78599-1247
Telephone: (956) 968-5402
Telecopier: (956) 969-9402

Page -19-